(No. 17836.—Reversed and remanded.)
MINNIE R. BARKER *et al.* Appellants, *vs.* SUE D. HAUBERG *et al.* Appellees.

*Opinion filed April 20, 1927—Rehearing denied June 8, 1927.*

1. PLEADING—*when Statute of Frauds cannot be availed of by demurrer.* The Statute of Frauds can be set up in defense upon demurrer only when it affirmatively appears by the bill that the agreement relied on was not evidenced by a writing duly signed; but a complainant is not required to do more than set out the contract in his bill, and where there is no statement in a bill for specific performance that the promises and agreements were not in writing, compliance with the Statute of Frauds will be presumed and the defense cannot be availed of upon demurrer.

2. SPECIFIC PERFORMANCE—*contract must be mutually enforceable.* A contract will not be specifically enforced by the court unless it is mutual and can be enforced by either of the parties against the other, and whenever, from personal incapacity, the nature of the contract or any other cause, the contract is incapable of being enforced against one party that party cannot enforce it against the other, although its execution in the latter way might in itself be free from the difficulty of its execution in the former.

3. SAME—*when contract cannot be specifically enforced—charity.* A contract whereby one party agrees to furnish all property and funds necessary for a certain charitable use while the other agrees to devote all her time, services and efforts to the work, direction, management and supervision of the charity for her lifetime cannot be enforced against the party agreeing to render the

services as it is merely a contract of employment; and even if it were enforceable against said party it cannot be enforced against the party agreeing to furnish the property and funds, where it is indefinite and uncertain as to the amount of funds to be furnished and provides no means for ascertaining the amount.

4. SAME—*a contract must be certain in its terms.* To be specifically enforced the terms of a contract must be completely free from doubt or ambiguity and must make the precise act which is to be done clearly ascertainable, and courts will not, as a rule, enforce a contract whose provisions are multifarious and whose obligations are continuing so that a final decree cannot be made which will end the matter, as where constant supervision and supplemental proceedings are required to enforce performance of continuing duties.

5. SAME—*person managing a public charity cannot compel its continuance to enable him to continue his services.* A director, manager, superintendent or other agent or employee engaged in the administration of a public charity cannot call on a court of equity to compel the continued maintenance and operation of the charity in order that he may continue to render the services necessary for such maintenance and operation, and if such party has a contract which will be violated by the abandonment of the charity his remedy is an action at law for the damages occasioned by the breach and not a writ of *mandamus* or bill for specific decree requiring the continued maintenance of the charity.

6. SAME—*what contract for conveyance may be specifically enforced.* Although a contract whereby one party agrees to furnish property and funds for the maintenance of a public charity while the other party agrees to render services in managing and directing the charity during her lifetime cannot be specifically enforced by the party agreeing to render the services, where it includes a promise by the other party to convey to such director or manager certain property for a home for herself and family the conveyance may be specifically enforced, as it is a valid contract based on a sufficient consideration.

7. CHARITIES—*who cannot complain of diversion of property devoted to charity.* Where property has been legally dedicated to the use of a public charity the Attorney General is the proper party to prevent its diversion from the use to which it was dedicated, and a private individual who is not a donor of the property to the charitable purpose or the heir of such donor cannot complain of its diversion.

APPEAL from the Circuit Court of Rock Island county; the Hon. WILLIAM T. CHURCH, Judge, presiding.

ANDREW OLSON, and KENWORTHY, DIETZ, SHALLBERG, HARPER & SINNETT, for appellants.

CURTIS & SIMONSON, and MARSHALL & MARSHALL, for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

Minnie R. Barker, her husband, Wilbur B. Barker, and their four children, William C., Francis M., J. Edwin and Sarah J. Barker, filed a bill in the circuit court of Rock Island county against Sue D. Hauberg, her husband, John H. Hauberg, and the West End Settlement of Rock Island, an Illinois corporation, to compel the specific performance of a contract, and have appealed from the decree therein which sustained the demurrer of the defendants and dismissed the bill for want of equity.

The bill alleged that for many years Mrs. Barker, with the assistance of other members of her family, had been engaged in charitable, social and religious work in the part of the city of Rock Island known as the West End and had established there a social settlement, where such services were carried on under the sole management and direction of Mrs. Barker with the assistance of the other complainants and with the financial aid and support of voluntary contributions and subscriptions of many citizens of Rock Island who were regular contributors to the social settlement, which was known as the West End Settlement, and were willing and able to continue to be such contributors. Miss Sue Denkmann, who lived in the West End, inherited great wealth from her father, who had acquired it in industrial business in the West End. She was interested in the welfare of the residents of that part of the city and acquainted with the work in which Mrs. Barker was engaged. On September 1, 1906, she proposed to and promised and agreed with Mrs. Barker that if Mrs. Barker would surrender the enterprise, business and social service

of the West End Settlement into the control of Miss Denkmann for the use of said charity in the community, and would agree to and would thereafter give and devote all her time, services and efforts to the work, direction, management and supervision of the enterprise, business and social service during the remainder of her life, Miss Denkmann would immediately take over and during such period would carry on, maintain, finance and support the enterprise, business and social service, and would build, construct, furnish and equip upon a site to be selected by Mrs. Barker, and would give and dedicate to the enterprise, business and social service, for its permanent use, an adequate and suitable modern and completely equipped settlement building in which to carry on and conduct such enterprise, business and social service, and would advance all the money necessary to carry on and meet all the present and future needs of the enterprise, business and social service during Mrs. Barker's life, and would construct, provide and furnish in said building a permanent home and living quarters for Mrs. Barker and such members of her family as desired to reside with her from time to time. Mrs. Barker agreed to and accepted the proposition and immediately gave up and surrendered the control and administration of the enterprise, business and social service and placed it in the hands and control of Miss Denkmann for the use of said charity in the community, and promised and agreed that she would thereupon and thereafter give and devote all of her time, services and efforts to the work, direction, management and supervision of the enterprise, business and social service, and that she at all times thereafter did give and devote all her time, services and efforts to such enterprise and is now ready and willing to continue to do so. Pursuant to this agreement Mrs. Barker selected as a site for the settlement building lots 8 and 9 in block 58 of the Chicago (or Lower) addition to Rock Island, which lots are designated in the bill as tracts No. 2 and No. 1,

respectively, and Miss Denkmann advanced the money necessary for their purchase, taking the title to tract No. 1 in the name of Mrs. Barker and tract No. 2 in the name of Mrs. Barker's husband, and the settlement ·building was erected on those tracts at the expense of Miss Denkmann, consisting of a gymnasium and office, baths and assembly rooms, class rooms and other quarters, and also rooms especially constructed, arranged and designed as a permanent home and living quarters for Mrs. Barker and the members of her family. Thereupon the settlement building was occupied and used for the purpose of conducting the enterprise and has ever since been so used, and Mrs. Barker and her family, the complainants, moved into and took possession of the building and ever since have continued to occupy and use it for the uses of the enterprise and have used and occupied the home and living quarters as the residence of Mrs. Barker and her family until January 1, 1916, when they moved out of the settlement house and into a residence on lot 5 in block 58, called tract No. 3 in the bill. From September 1, 1906, Miss Denkmann maintained, financed and supported the enterprise until about September 1, 1923. It was carried on in other buildings and temporary quarters were provided by Miss Denkmann until the completion of the settlement house on October 1, 1909, when the enterprise, business and social service was transferred to the settlement building and since that date has been carried on in that building, which was permanently marked by Miss Denkmann with the inscription, "West End Settlement," cut in large letters in the stone arch over the main entrance, and at the time of such transfer Miss Denkmann openly and publicly dedicated the settlement building to the enterprise, business and social service. The expense of the erection of the settlement building was $30,000, and the operating expenses to September 1, 1923, amounted to $8000 a year, all of which were paid by Miss Denkmann. On March 5, 1910, Miss Denkmann purchased lot 5, called

in the bill tract No. 3, which· is in the same block 58 and adjoins tracts Nos. 1 and 2, and it was conveyed to her. On June 29, 1911, she married the defendant John H. Hauberg. On September 25, 1912, Mrs. Hauberg purchased lot 4 in the same block 58, which is called in the bill tract No. 4, on which there was then a residence, which was immediately occupied by the West End Settlement and used as a men's club room and lodge rooms. The title to tract No. 4 was taken in the name of John H. Hauberg. About January 1, 1916, Mrs. Hauberg represented to Mrs. Barker that because of the growth of the enterprise it was necessary to use the living quarters of Mrs. Barker and her family to accommodate her needs, and if Mrs. Barker and her family would move out Mrs. Hauberg would build a dwelling house for her and her family on tract No. 3 and would convey the lot and the dwelling house to Mrs. Barker in fee. Mrs. Barker agreed to the proposition, and Mrs. Hauberg built the dwelling house as planned by Mrs. Barker to suit the needs of her and her family and Mrs. Barker and her family moved into it. Another tract, called in the bill tract No. 5, consisting of lots 7 and 10 and the south ten feet of lot 6, in the same block 58, was purchased by Mrs. Hauberg on June 17, 1918, and the building on the lot was thereafter used as a day nursery during week days and for a primary Sunday school department on Sundays. Mrs. Hauberg, in violation of her agreement, neglected and refused to convey the dwelling house which had been built on tract No. 3 to Mrs. Barker, and on July 7, 1923, designing to deprive her and her family of their rights and to defraud her, notified Mrs. Barker that Mrs. Hauberg would no longer carry on the enterprise and would not provide for and support Mrs. Barker and her family and demanded that Mrs. Barker deliver up possession of all the tracts of land.

The bill states that Mrs. Hauberg required, as a part of the understanding and agreement of September 1, 1906,

that Mrs. Barker should not only give up, surrender and place in the hands and control of Mrs. Hauberg the enterprise, business and social service, but also that thereafter the enterprise, business and social service should be supported and financed exclusively by Mrs. Hauberg, and that neither Mrs. Barker nor the enterprise, business or social service should receive or accept any support or contributions from the regular, substantial and permanent contributors and subscribers to Mrs. Barker and the enterprise, business and social service or from any other person. This was consented and agreed to and complied with by Mrs. Barker, so that she lost and gave up not only the enterprise, business and social service, but also the good will, support and subscriptions of large numbers of public spirited and charitable citizens of the city of Rock Island and vicinity, all of which have been completely and irrevocably lost to her. The prayer of the bill is that Mrs. Hauberg be compelled to carry out and perform all the terms and provisions of the agreements on her part, to convey to Mrs. Barker tract No. 3, with the dwelling house thereon, and that John H. Hauberg be decreed to join in the conveyance; that Mrs. Hauberg be decreed to provide a permanent home and living quarters for Mrs. Barker and such members of her family as may desire to reside with her from time to time during her life; that tracts Nos. 1 and 2, and the settlement building thereon, be decreed to be forever held and dedicated to the use and purpose of the enterprise, business and social service; that she be decreed to pay to Mrs. Barker from time to time such sums as may be found by the court to be reasonable and necessary for the support and maintenance of Mrs. Barker and such of the members of her family as may desire to reside with her from time to time during her life; that an account may be taken between Mrs. Barker and Mrs. Hauberg under the terms and provisions of the agreements between them with reference to support and maintenance of Mrs. Barker and the mem-

bers of her family after September 1, 1923, and that Mrs. Hauberg may be required to pay Mrs. Barker such sum of money as may be found to be due her upon such accounting; and that she may be decreed to carry on, maintain, finance and support the enterprise, business and social service during the life of Mrs. Barker to the extent and manner in which they have been carried on, maintained, financed and supported by her prior to September 1, 1923, and for other relief.

The appellees rely upon the Statute of Frauds, assuming that the bill seeks to enforce an oral contract in regard to real estate. The rule is well settled in this State that the benefit of the Statute of Frauds as a defense can be taken by demurrer only when it affirmatively appears by the bill that the agreement relied on was not evidenced by a writing duly signed. (*Switzer* v. *Skiles,* 3 Gilm. 529; *Speyer* v. *Desjardins,* 144 Ill. 641; *Hamilton* v. *Downer,* 152 id. 651; *Fowler* v. *Fowler,* 204 id. 82.) The bill alleged that Mrs. Hauberg proposed to and promised and agreed with Mrs. Barker and Mrs. Barker agreed to and accepted the proposition, and that Mrs. Hauberg represented and stated to Mrs. Barker, and upon her statements, representations and promises Mrs. Barker agreed. It is nowhere stated that the promises and agreements were not in writing. A complainant is not required to do more than set out the contract in his bill, and a compliance with the Statute of Frauds will be presumed. *Speyer* v. *Desjardins, supra.*

The doctrine is well settled that a contract will not be specifically enforced by the court unless it is mutual,—that is, unless it is of such a character that at the time it was entered into it might have been enforced by either of the parties against the other. Whenever, from personal incapacity, the nature of the contract or any other cause, the contract is incapable of being enforced against one party that party is incapable of enforcing it against the other, though its execution in the latter way might in itself be

325—35

free from the difficulty attending its execution in the former. (Fry on Specific Performance, sec. 286; Waterman on Specific Performance, sec. 196; 2 Beach on Contracts,— 2d ed.—sec. 166; *Tryce* v. *Dittus,* 199 Ill. 189; *Gage* v. *Cummings,* 209 id. 120; *Bauer* v. *Lumaghi Coal Co.* id. 316; *Ulrey* v. *Keith,* 237 id. 284; *Africani Loan Ass'n* v. *Carroll,* 267 id. 380; *Bartholomae & Roesing Brewing Co.* v. *Modzelewski,* 269 id. 539; *Rutland Marble Co.* v. *Ripley,* 10 Wall. 339.) If it be conceded that this contract is of such a character that a court of equity might compel Mrs. Hauberg to perform specifically at the suit of Mrs. Barker, still the court will not compel such performance unless at the same time the contract could be enforced against Mrs. Barker in favor of Mrs. Hauberg. This the court could not do. Mrs. Barker accepted Mrs. Hauberg's proposition and in consideration thereof promised and agreed that she would thereafter give and devote all her time, services and efforts to the work, direction, management and supervision of the enterprise, business and social service during her life. This was a mere contract of employment— of hiring by Mrs. Hauberg of the skilled work of Mrs. Barker as a social worker of experience for her life. Such a contract cannot be enforced against the employee. *Welty* v. *Jacobs,* 171 Ill. 624; *Ulrey* v. *Keith, supra.*

It is alleged in the bill that the work of the enterprise, business and social service carried on in the settlement building consisted of kindergarten teaching, with classes of from 60 to 70 pupils, with three teachers; girls' sewing classes, with from 80 to 90 pupils, with three paid instructors and seven volunteer instructors; mothers' sewing classes, with an enrollment of over 100; girls' gymnasium classes, with from 80 to 90 pupils, ranging from twelve years to twenty years; boys' gymnasium classes, with from 50 to 60 pupils, consisting of boys under fifteen years of age; cooking classes for girls from twelve to fourteen years, one to two classes, with about 15 in each class;

young boys' cooking class, comprised of pupils from ten to fifteen years; a little mothers' class, consisting of from 15 to 20; child welfare work, weekly clinics, with from 50 to 100 patients and attendants; Sunday school classes, with an enrollment of 500 pupils, and morning and evening preaching services on Sundays, and Wednesday and Friday night prayer meetings; also nursing service and general outside aid, together with community entertainments, picnics, and other service of a social and religious nature providing opportunities of a social and recreative character, together with educational, cultural and religious instruction for citizens in the community requiring such social and religious service as aforesaid; that all of this service was carried on pursuant to the agreement between Mrs. Barker and Mrs. Hauberg and under the auspices of the West End Settlement, and during all the time from September 1, 1906, to September 1, 1923, the operating charges and expenses of carrying on and conducting such enterprise, business and social service were paid by Mrs. Hauberg pursuant to her agreement and amounted to $8000 a year. .

A part of the relief sought by the bill is that Mrs. Hauberg be decreed to carry on, maintain, finance and support this enterprise, business and social service during the life of Mrs. Barker in the same manner that it was carried on prior to September 1, 1923, and that a mandatory injunction issue commanding and compelling her to keep and perform all the terms and provisions of the agreement. It is not alleged that Mrs. Hauberg agreed to contribute any specific amount to the purpose mentioned or that she agreed to conduct the particular character of social service alleged to have been carried on in the settlement building, or what weekly clinics, visiting nurse service, community entertainments, picnics, and other service of a social or religious nature she was obliged to provide, or what social opportunities or specific educational, cultural and religious instruction should be provided or for what citizens in the com-

munity requiring such social and religious service they should be provided. No limit is mentioned as to the amount which she should contribute from time to time and no means of determining to what extent she was bound to contribute. One of the fundamental principles respecting the specific performance of contracts is that the performance will not be decreed where the contract is not certain in its terms. The terms must be completely free from doubt or ambiguity and make the precise act which is to be done clearly ascertainable, and as a general rule courts will not enforce a contract whose provisions are multifarious and whose obligations are continuing, so that a final decree can not be made which will end the matter but will require constant supervision and supplemental proceedings to enforce the performance of constantly recurring duties. The contract provides for no fixed sum for the purposes of the settlement and provides no means for ascertaining the amount which Mrs. Hauberg would be required to pay. It contains no description or definition of the character or amount of the social service which shall be rendered or what part of the community shall be served. All these things are left to be determined by the court without any agreement between the parties for a guide. The court cannot make a final decree during Mrs. Barker's lifetime but must exercise a continuous supervision over the enterprise, business and social service, and determine from year to year and from time to time the character and quantity thereof and the persons to be served, the amounts which Mrs. Hauberg shall contribute from year to year, the number of workers to be employed and the salaries they shall be paid, the amount Mrs. Barker shall receive for the support and maintenance of herself and such of her family as choose to reside with her, and all the details of the business. The enforcement of performance by Mrs. Hauberg would be attended with as serious difficulty as the enforcement of performance by Mrs. Barker. The contract as alleged is

not of such a character as a court of equity will specifically
enforce in favor of either party.

By the original contract Mrs. Barker was to acquire no
interest in any property, real or personal, except suitable
living quarters for herself and such members of her family
as desired to live with her in the settlement house to be
built on such site as Mrs. Barker should select. However,
the two lots on which the building was constructed were
conveyed, one to Mrs. Barker and the other to her husband,
but two years later, when the husband was very ill. and it
was feared he would die, at Mrs. Hauberg's request and
on her representation that in case of his death leaving
minor children the title of the site might become compli-
cated in the administration of his estate, the two lots were
conveyed to Mrs. Hauberg. In regard to this conveyance
the bill. alleged that it was made in the belief that Mrs.
Hauberg intended in good faith to hold the site, settle-
ment building, home and living quarters to better preserve
and secure the uses and purposes thereof in accordance with
the terms and provisions of the agreement, and that any
attempt to withhold or divert the site, settlement building,
home and living quarters from the uses and purposes there-
of is in violation of the inducement and agreement under
which the conveyance was made to Mrs. Hauberg and in
violation of the confidence and trust reposed in her by
Mrs. Barker and her husband; that Mrs. Barker was in
constant communication with Mrs. Hauberg and often con-
sulted her about the enterprise, business and social service
and the matters pertaining thereto and a close friendship
and confidential relation grew up between them, by reason
of which Mrs. Barker in her dealings with Mrs. Hauberg
was at all times entirely disarmed and at all times implic-
itly relied upon the good faith of any statement, represen-
tation, declaration or agreement that Mrs. Hauberg made,
and never suspected that Mrs. Hauberg would not faith-
fully carry out the agreements made by her or would with-

hold or divert the settlement building from the dedication to the uses and purposes of the enterprise, business and social service as aforesaid, and except for the statements, representations and inducements of Mrs. Hauberg to her Mrs. Barker would not have made the conveyance, and in view of the subsequent acts and conduct of Mrs. Hauberg her said statements, inducements and representations were false and fraudulent statements, inducements and representations, and, as Mrs. Barker is now informed and believes and therefore states the fact to be, were all made by Mrs. Hauberg wickedly and maliciously and with the false and fraudulent intent and purpose to deliberately defraud Mrs. Barker and her husband in procuring from them the conveyance of the site of the settlement building. The bill charges that the acts of Mrs. Hauberg and her attempt to withhold and divert the site and settlement building from the uses and purposes for which they were acquired, constructed and dedicated are a fraud upon Mrs. Barker, and in equity and good conscience the site and settlement building should be decreed to be forever held and devoted to the uses and purposes for which they were so acquired, constructed and dedicated.

The only indications of fraud in these allegations are contained in the adjectives which accompany them. The facts alleged do not sustain any such charge. All the money invested in the lands and buildings was Mrs. Hauberg's. The reason she gave for asking a conveyance to be made was a valid reason and was conceded to be so by Mrs. Barker and her husband, who complied with the request to make the conveyance without any hesitation and for fifteen years made no objection to the conveyance. There is no legal averment of fraud. If there were, the *laches* of Mrs. Barker would be a complete defense to it. Moreover, Mrs. Barker has no standing in court to compel the application of the property to the charity and prevent its diversion from that purpose. The directors, managers, `

superintendents or other agents or employees engaged in the administration of a public charity have no right to call on a court of equity to compel the continued maintenance and operation of the charity in order that such agents or employees may continue to render the services necessary for such maintenance and operation. If such an agent or employee has a contract which will be violated by the abandonment of the charity, his remedy is an action at law for the damages occasioned by the breach, and not a writ of *mandamus* or bill for a specific decree requiring the continued maintenance of the charity in order to furnish an employee an opportunity to render the service which he has contracted to render. If the property has been dedicated legally to the use of the charity the Attorney General is the proper person to prevent its diversion if it should become necessary to proceed for that purpose. A private individual not a donor of the property to the charitable purpose or the heir of a donor cannot complain of its diversion.

The conveyance was not made upon any trust but was merely a conveyance of the title to Mrs. Barker and her husband. When the property was purchased, Mrs. Hauberg having furnished all the consideration and the conveyance having been made to Mr. and Mrs. Barker, a resulting trust arose in favor of Mrs. Hauberg, and when the Barkers conveyed to her it was simply putting the title in the name of the real owner. Mrs. Barker thereafter had no interest in the title, either legal or equitable. The contract which she alleged in her bill was merely a personal contract of Mrs. Hauberg that Mrs. Barker should have living quarters for herself and such members of her family as chose to live there. The property remained Mrs. Hauberg's, subject to no other claim or interest of Mrs. Barker's. Seven or eight years later Mrs. Hauberg represented to Mrs. Barker that because of the growth of the enterprise it was necessary to use the living quarters of Mrs. Barker and her family to accommodate her needs, and if Mrs. Barker and her fam-

ily would move out Mrs. Hauberg would build a dwelling house for her on tract No. 3 and would convey the lot and dwelling house to Mrs. Barker in fee. Mrs. Barker agreed to the proposal, and Mrs. Hauberg built the dwelling house as planned by Mrs. Barker and Mrs. Barker and her family moved into it. This contract, as alleged in the bill, is presumed to have been in writing, in compliance with the Statute of Frauds. As stated in the bill, it was a valid contract based upon a sufficient consideration,—the surrender of Mrs. Barker's right to the occupancy of living quarters in the settlement building,—and its terms having been complied with, the bill as to this lot states a good ground for a specific performance of the contract to convey it to Mrs. Barker.

So far as the original contract is concerned, it does not state a case entitling Mrs. Barker to a specific performance for the reasons which have been stated. Her contract was to give and devote all of her time, services and efforts to the work, direction, management and supervision of the enterprise, business and social service during her life, and that contract could not be completely performed until the termination of her life. The averments of the bill show no interest in any of the complainants except Mrs. Barker, but no question has been made on that fact in the argument and we shall therefore give it no consideration. On the averments of the bill Mrs. Barker was entitled to relief in regard to tract No. 3, and for that reason the demurrer should have been overruled.

The decree is reversed and the cause remanded, with directions to overrule the demurrer.

*Reversed and remanded, with directions.*