173 So. 74
**STATE ex rel. CARMICHAEL, Atty. Gen.,
v. BIBB et al.**
**7 Div. 429.**

Supreme Court of Alabama.
March 4, 1937.

Rehearing Denied March 25, 1937.

Ross Blackmon, of Anniston, and Mulkey & Mulkey, of Geneva, for appellant.

Roy M. Woolf, of Anniston, for appellees.

48

er the evidence on a hearing of the cause supports these averments is a matter of future determination.

The bill seeks the establishment and enforcement of a public charity, the removal of said Bibb as such trustee, an accounting by him, the appointment of a trustee by the court to execute the trust in place of said Bibb, and for the sale for partition of certain real estate for division among the alleged joint owners.

The respondent Bibb, in his individual capacity and as trustee, filed his separate demurrer to the bill, but this demurrer was overruled by the court, and no appeal was taken from this decree, and hence the propriety of the court's ruling in this respect is not now before us.

There was a joint demurrer by the respondents A. P. Agee, Ellen Agee Foster, Caroline Agee Rowan, Mary Blackwell Wells, J. V. Blackwell, H. B. Blackwell, Louise Blackwell, and Julia Blackwell Patton, to the bill as a *whole*, which was sustained by the court, and it is from this ruling that the present appeal is prosecuted.

It appears from the bill that one L. H. Kaplan, for many years a resident of the city of Anniston, in the State of Alabama, died seized and possessed of a considerable estate, and leaving a last will and testament, which was admitted to probate and record, in common form, in the probate court of Calhoun county; the exact date of its probate is not shown, but it was upward of twenty years ago.

By the ninth paragraph of the will, the testator made the following testamentary provision:

"I devise to said trustees, the block on Noble Street, between Eighth and Ninth Streets, being block number one hundred and thirty, according to Anniston City Land Company map of the city of Anniston, in trust for the following purpose:

"The said block is devised to said trustees in trust for the following uses: a one-half interest therein to the Jewish Hospital for Consumptives at Denver, Colorado; a one-fourth interest therein to the Jewish Hospital at Jerusalem; and a one-fourth interest therein to be used for the purpose of establishing a free non-sectarian public hospital in the city of Anniston, Alabama, to be known as the Kaplan Hospital."

KNIGHT, Justice.

This appeal is prosecuted from an interlocutory decree sustaining a demurrer interposed by certain of the respondents to a bill filed by the State, on relation of the Attorney General, against John D. Bibb, individually, and as trustee under the will of L. H. Kaplan, deceased, and others.

In a former decision of this court, on appeal by the original trustee seeking a construction of the will of said Kaplan, this court held the bequests made to the Jewish Hospital for Consumptives at Denver, Colo., and to the Jewish Hospital at Jerusalem were charitable bequests, and sustained the validity of the same. No question was raised in that case as to the validity of the charitable devise for the purpose of establishing the hospital at Anniston. National Jewish Hospital for Consumptives v. Coleman, 191 Ala. 150, 67 So. 699, decided November 7, 1914.

Let it be understood in the outset that, in the consideration of this case, on this appeal, we have treated all averments of the bill, which are well pleaded, as true, as we must do on demurrer. Wheth-

By the will Thomas W. Coleman, A. H. Sheppard, and M. B. Wellborn, all of Anniston, were appointed trustees to carry out and execute the trusts created by it.

By the eleventh paragraph of his will the testator devised and bequeathed to the named trustees all of his property, to be held by them for the uses above set forth, except that he gave the property which he owned in Asia, just outside of the city of Jerusalem, direct, free of any trust, to his brother-in-law Mordecai Max Ben Sin.

By the same clause, he made the following consecutive provisions:

"The annuities above bequeathed are not to be charged on any specific portion of my estate, but on the whole thereof, except the said block one hundred and thirty (the property devised in trust for the hospitals mentioned in item nine of the will) *the income from which is to be used for the three charities aforementioned.*

"In case of my (any) failure of any legacy, I devise the remainder is to go as above directed to said three charities in the propositions (proportions) shown, as residuary legatees and deviatees (devisees). In case of the failure of any bequest devised to any of said charities, so that the same cannot share, in the residuum of my estate, then the remaining charity or charities, which shall be competent to take said estate, shall be the residuary legatee in the proportion above shown, that is to say, if there is a failure as to the Denver Hospital, then my residuary legatees shall be the Anniston Hospital and the Jerusalem Hospital in equal shares; if failure as to the Denver Hospital and the Jerusalem Hospital, then my residuary legatee shall be the *Anniston Hospital, above described to be established;* if failure as to the Jerusalem Hospital then the *residuary* to the Denver Hospital and the Anniston Hospital, to be known as the Kaplan Hospital, in the proportion, two-thirds to the Denver Hospital and one-third to the Anniston Hospital." (Italics supplied.)

It is to be here noted, from the averments of the bill, that during the time that A. P. Agee was trustee, under appointment of the court, in executing the trust created by the said will, he and his wife, Mrs. Ellen S. Agee, and his law partner, D. C. Blackwell, "acquired by purchase the devise to the Bicur-Cholim Hospital at Jerusalem; and A. P. Agee and John D. Bibb purchased the one-half interest in said block one hundred and thirty devised by said Kaplan to the Jewish Hospital for Consumptives at Denver, Colorado." We shall have occasion to refer hereinafter to these alleged purchases.

It appears that the trustees named in the will, viz., Thomas W. Coleman, A. H. Sheppard, and M. B. Wellborn, after entering upon the discharge of their trust duties, resigned their office as trustees on or about October 17, 1917, and A. P. Agee was duly appointed as sole trustee in their stead. That said Agee duly qualified as such trustee, and continued to act in that capacity "down to and including 28th day of May, 1920, at which time he resigned." That said Agee made final settlement of his trusteeship in the circuit court of Calhoun county, in equity, at which time it was ascertained that said Agee, as such trustee, "held funds in trust for the Kaplan Hospital as designated by said will amounting to $6,037.00 in cash and 'gilt-edge' securities."

It is alleged that upon the resignation of said Agee, as such trustee, on May 28, 1920, the court appointed, as his successor in said office of trustee, the respondent John D. Bibb, who duly qualified as such trustee, and entered upon the duties of said office, and that said Agee thereupon turned over the property, funds, and securities to said Bibb. That Bibb, upon his qualification as such succeeding trustee, collected the rents issuing from the entire trust property, to wit, block 130 in the city of Anniston, from June 5, 1920, to February 1, 1928, *at which time it is averred "the other owners of the property assumed the management and control of said block and the collection of the rents issuing therefrom, from which time the said Bibb has not had further control of said block."*

It is charged that said Bibb, during the time he collected the rents, had collected rents in the aggregate amount of $65,-049.84, one-fourth of which inured to the Anniston, or Kaplan Hospital fund. This one-fourth, therefore, amounted to $16,-262.46, less commissions and expenses.

It is further charged that said Bibb, as such trustee, has charged for commissions and expenses against the rental fund, during the period from June 5, 1920, to February 1, 1928, the aggregate sum of

$35,252.43. It is further charged that said Bibb as such trustee has received for the Anniston or Kaplan Hospital the following amounts: Cash from his predecessor, $6,-037; collected by himself as rent due the Kaplan Hospital, $16,262.45; and rentals turned over to him by A. P. Agee and Louise Blackwell from February 1, 1928, $10,233.09—making the total amount collected by said Bibb for and on account of the bequest to the Anniston or Kaplan Hospital $32,532.54, without taking into account any interest that may have been collected by said trustee on any loans made by him of said funds.

With reference to the handling of said funds, it is averred: "Whereas, owing to the incompetency and lack of business ability and knowledge of the correct usages of business and adequate knowledge of real estate values in Anniston, Alabama, and vicinity, the said trustee has dissipated, misloaned and misspent said trust fund until he has on hand as securities representing the assets of this trust estate at the present time as above itemized, fifty-eight mortgages aggregating a total value of $33,905.46, which are probably not worth more than forty per cent. of their face value, many of the mortgagors being dead, and others utterly and hopelessly insolvent, and the mortgage security of little or no value."

It is also charged: "That substantially all the loans shown on the list of securities constituting exhibit 'E' (showing loans made by Bibb as trustee of funds belonging to the Kaplan Hospital fund) were negotiated by John D. Bibb, as agent of the borrowers with himself as trustee of the Kaplan Hospital fund. That, by this method, he secured as compensation to himself, ten per cent. for receiving the fund as trustee, a commission for loaning the money or securing the money as agent of the borrower, plus the usual charge for making the abstract of title and preparing the mortgage."

The bill makes the following averment, in substance, as to reports by said Bibb to the court: That said Bibb, as trustee, has made no report to the chancery court of the manner and method which he has employed and pursued in and about the handling of said trust funds; "that after the lapse of practically fifteen years, the said Bibb has filed in the office of the Register in Chancery of Calhoun County, Alabama,

what he describes and classes as a partial report of his acts as such trustee."

It also appears from the bill that all the indebtedness of the estate has been paid, and that there are no lawful liens or claims against the trust fund to hinder or impede the court from ordering the trust to be "specifically enforced."

The bill also avers that the respondents A. P. Agee, Ellen Agee Foster, Caroline Agee Rowan, Mary Blackwell Wells, J. V. Blackwell, H. B. Blackwell, Louise Blackwell, and Julia Blackwell Patton (the supposed interest of each being stated) own three-fourths undivided interest in said block 130 (the block impressed with the trust) and said Bibb as such trustee owns the other one-fourth undivided interest; that said land cannot be equitably divided between the tenants in common, and it is necessary to sell the same to effect an equitable division of the proceeds.

No steps have been taken during the twenty years that have elapsed since the death of the testator to carry out the terms of said trust for establishing the free nonsectarian public hospital in the city of Anniston, to be known as the Kaplan Hospital.

We are fully persuaded that the bill contains equity in those phases which seek an accounting by the respondent Bibb of his trusteeship, for his removal as such trustee, the appointment of a new trustee, and for the establishment and enforcement of a public charity created under and by the will of L. H. Kaplan, deceased, and that the bill was properly filed by the State on the relation of the Attorney General. This we shall attempt to demonstrate.

It is not to be doubted that the testator, long a resident of the city of Anniston, intended the gift to the named trustees as a public charity, and such being the character of the gift, this case must be determined upon equitable principles and rules applicable to charitable gifts. And this court is fully committed to the doctrine, long prevailing in America, that trusts for charitable uses are favored by courts of equity, and that, independent of the statute of Forty-Third Elizabeth, and of the *prerogative power,* there is an original and inherent jurisdiction in courts of equity, both Anglican and American, to sustain, and enforce, on account of their charitable purposes, trusts which, but for the charitable feature, would be held void. Williams v. Pearson, 38 Ala. 299; Carter

v. Balfour's Adm'r, 19 Ala. 814; Johnson v. Holifield, 79 Ala. 423, 58 Am.Rep. 596; Tarver et al. v. Weaver et al., 221 Ala. 663, 130 So. 209. In the books it is said the thing given becomes a charity where the uncertainty of the recipients begin. Fontain, Adm'r, v. Ravenel, 17 How. 369, 384, 15 L.Ed. 80.

It is not to be doubted also that while courts of equity have original and inherent jurisdiction, independent of the statute of Forty-Third Elizabeth and of the prerogative power to sustain and enforce charitable trusts, this power and jurisdiction must in the nature of things lie dormant until its interposition is properly and timely invoked. State ex rel. Heddens v. Rusk, 236 Mo. 201, 139 S.W. 199. When so quickened into action, the court, in the plentitude of its jurisdiction, will assume control of the trust, and administer it in accordance with its terms. It will not permit the trust to fail for want of a trustee. Nor will it permit an unfaithful, or incompetent trustee, whether such trustee is appointed by the instrument creating the trust, or is one of its own appointment, to continue in office, but the court will, on timely application and showing, remove such unfaithful or incompetent trustee, and appoint another. Code, §§ 10450, 10451; Amos v. Toolen, et al., 232 Ala. 587, 168 So. 687; Bethea v. Bethea, 116 Ala. 265, 22 So. 561; Jones v. McPhillips, 82 Ala. 102, 2 So. 468.

The allegations of the bill in these respects are sufficient to invoke this plenary jurisdiction. It shows that for a period of over twenty-five years the public charity, founded by Mr. Kaplan, has been either smothered, or allowed to slumber, and the trust funds, if the averments of the bill are true as they must be treated on demurrer, have been exploited for personal gain, and not one step has been taken to carry into effect, or to make available to the cestui que trust, the charity created by the will. It is but the statement of a self-evident truth to say, that a trust with no power to execute is no trust. And it is likewise true that a trust creating a public charity, should not be allowed to slumber for twenty-five years, during all of which time only the trustee has been benefited. The trust should be quickened into life, or, if this cannot be done, the trust fund, in common honesty, should be returned to the blood of the acquiring ancestor.

The bill shows that the present trustee, some eight years ago, in utter disregard of the terms of the trust, which required him to manage and control the trust property, not simply a part of it, but all of it, abdicated in effect his office of trustee, and delivered over the possession, management and control of the property to others. This act on the part of the trustee constituted a palpable breach of the trust. Gaines v. Dahlin et al., 228 Ala. 484, 154 So. 101; Tilley v. Letcher, 203 Ala. 277, 82 So. 527; McDonald v. McDonald, 92 Ala. 537, 9 So. 195. This act of abandonment on the part of the trustee of his duties cannot be justified by any language of the will. And this act alone might, probably would, furnish sufficient ground for his removal.

Again the bill shows that for more than fourteen years the trustee made no report whatsoever of his acts and doing.

We are fully persuaded the bill states a case for an accounting, the removal of the trustee, and the appointment of a new trustee, and the only question to be determined is: Did the State of Alabama, on the relation of the Attorney General, have the right to file the bill?

We have heretofore pointed out that the bequest made for the establishment of Kaplan Hospital in the city of Anniston, Ala., being a charitable bequest, a court of equity could give it effect by virtue of its common-law and judicial power, without claim to any *prerogative* power, and without invoking the aid of the statute of Forty-Third Elizabeth, and this is true although the cestui que trust may not be so definitely described as to enable a court of equity to execute the trust upon its ordinary principles. Williams v. Pearson, supra; Carter v. Balfour's Adm'r, supra.

The power, then, to quicken into exercise this equitable jurisdiction must exist somewhere, and in some one.

We have no authoritative expression of this court on the right of the State, on relation of the Attorney General, to intervene in such cases under a state of facts such as here presented. However, abundant authorities are to be found in other jurisdictions holding that in such cases, the State, or the Attorney General, may bring a suit in equity to enforce such a trust as was created by the will now before us.

In 22 Encyclopædia of Pleading and Practice, 205, it is said:

"Where the trust is for a public charity, there being no certain persons who are entitled to it so as to be able to sue in their own names as cestuis que trustent, a suit for the purpose of having the charity duly administered must be brought in the name of the state or the attorney general, and it seems that in all cases the attorney general may maintain the suit with or without a relator."

"Charitable trust is of public concern and the attorney general is the protector of the interest of the public, or, what is the same thing, of the indefinite and fluctuating body of persons who are the cestui que trust.

"In fact, the attorney general is the only one who can properly invoke the superintending power of the courts over the administration of such trusts." 2 R.C.L. p. 923, § 12.

The author of the notes to the case of Dickey v. Volker, 321 Mo. 235, 11 S.W.(2d) page 278, reported in 62 A.L.R. 858, says:

"It has been said that there are four classes into which the principal causes in which litigation arises respecting charity property may be divided: * * * (3) the trustees of the charity may improperly sell or lease the property to some person having a knowledge of the trust; and (4) the trustees of the charity may apply the property to wrong objects or appropriate it to their own use; that in the third and fourth classes of cases, the attorney general, as representing the state, is the proper person to begin the suit.

"In accord with these views there are many cases which support the general proposition that the state, or, more particularly, the attorney general, is the proper party ordinarily to maintain a suit to enforce or administer, or prevent diversion of, a charitable trust."

See, also, in this connection, 5 R.C.L. pp. 359, 360; Late Corporation of the Church of Jesus Christ of L.-D. S. v. United States, 136 U.S. 1, 10 S.Ct. 792, 34 L.Ed. 481; People, ex rel. Ellert, v. Cogswell, 113 Cal. 129, 45 P. 270, 35 L.R.A. 269; Schell v. Leander Clark College (D.C.) 10 F.(2d) 542; Attorney General v. Ill. Agri. College, 85 Ill. 516; Barker v. Hauberg, 325 Ill. 538, 156 N.E. 806; Attorney General v. Wallace's Devisees, 7 B.Mon.(Ky.) 611; Jenkins v. Berry, 119 Ky. 350, 83 S.W. 594; Andover Theological Seminary v. Theological Inst., 253 Mass. 256, 148 N.E. 900; Dickey v. Volker, 321 Mo. 235, 11 S.W.(2d) 278, 62 A.L.R. 858; Re Creighton's Estate, 91 Neb. 654, 136 N.W. 1001, Ann.Cas.1913D, 128; Re Burnham, 74 N.H. 492, 69 A. 720; Attorney General ex rel. Bailey v. Moore's Ex'rs, 19 N.J.Eq. 503; Bible Readers' Aid Society v. Katzenbach, 97 N.J.Eq. 416, 128 A. 628; Associate Alumni v. General Theological Seminary, 163 N.Y. 417, 57 N.E. 626; Wemme v. First Church of Christ, 110 Or. 179, 219 P. 618, 223 P. 250; Stearns v. Newport Hospital, 27 R.I. 309, 62 A. 132, 8 Ann.Cas. 1176; Nolfe v. Byrne, 142 Tenn. 309, 219 S.W. 1; Carroll v. Beaumont (Tex.Civ.App.) 18 S.W.(2d) 813; Clark v. Oliver, 91 Va. 421, 22 S.E. 175.

We are of the opinion that the State, upon the relation of the Attorney General, was a proper party to institute the present suit. Authorities supra.

It is earnestly insisted that our holding in the case of Davis, Atty. Gen., ex rel. First Baptist Church, Colored of Montgomery v. Stokes et al., 214 Ala. 234, 107 So. 76, is conclusive against the right of the complainant to maintain the present suit.

It is true that this court in the Stokes' Case held that the Attorney General was not a proper party to the proceedings instituted and had in that case, and we there pointed out that the cases holding that he was a proper party proceeded upon the theory that, for the protection of a charitable trust, the State was interested, and therefore could, and would, through its chief prosecuting officer, obtain the interposition of a court of equity. The court also held that the doctrine of parens patriæ was not recognized in this State. This statement of the Court was rested largely upon the decision of the Supreme Court of Tennessee in the case of Ewell v. Sneed, 136 Tenn. 602, 191 S.W. 131, 5 A.L.R. 303. The court also cited our own case of Williams v. Pearson, supra.

It is conceded that the doctrine of parens patriæ does not exist in this State. But there is no effort here to resort to that doctrine. The appeal here is to the original and inherent power of a court of equity to protect a charitable trust from abuse and misuse, and possible destruction. This right exists independent of the prerogative right.

The Supreme Court of Tennessee has given its full approval to the following statement of the law by Judge Story,

Story's Equity Jurisprudence, § 1191: "Where a charity is definite in its objects, and lawful in its creation, and it is to be executed and regulated by trustees, whether they are private individuals or a corporation, there the administration properly belongs to such trustees, and the King, as parens patriæ, has no general authority to regulate or control the administration of the funds. In all such cases, however, if there be any abuse or misuse of the funds by such trustees, the court of chancery will interpose, at the instance of the attorney general, or the parties in interest, to correct such abuse or misuse of the funds." Heiskell v. Chickasaw Lodge, 87 Tenn. 668, 11 S.W. 825, 826, 4 L.R.A. 699; Nolfe v. Byrne, 142 Tenn. 309, 219 S.W. 1, supra.

In the Stokes' Case, supra, there was no occasion to invoke the doctrine of parens patriæ, or to determine whether, in a case like the present, the State, on relation of the Attorney General, could invoke the common-law powers of a court of equity to prevent the abuse or misuse of the trust funds. In that case the Attorney General on the relation of the First Baptist Church, Colored, of Montgomery, was made a party complainant to the bill. There was no necessity for making the attorney general a party, as the church was a body corporate, with power to institute the suit to recover its own property, suing in its own name. There was no occasion for the appearance of the Attorney General in the suit, as party complainant or otherwise. The court so held.

In the present case, the bequest being for charitable purposes, a court of equity could give it effect by virtue of its common-law and judicial powers, without claim to any *prerogative power,* and without invoking the aid of the statute of Forty-Third Elizabeth. And the exercise of this jurisdiction and power could be invoked by the State, on relation of the Attorney General, there being no other person clothed with the power to invoke this jurisdiction.

This holding is supported by the holding of the courts of last resort in a vast majority of the States of the American Union. And this was the effect of the holding in the case of Williams v. Pearson, supra. To hold otherwise would be tantamount to holding that no matter how lawful the trust may be, nor how beneficent its purposes, a court of equity would be power-less, in cases like the present, to intervene and check the abuse or misuse of the trust funds, or to exercise any control over a recalcitrant or faithless trustee. No court, we take it, will sanction such a doctrine.

There was, therefore, no merit in that ground of demurrer interposed to the bill by the appellees, which challenges the right of the State on relation of the Attorney General to file the bill.

The appellees' demurrer (addressed to the bill as a whole) challenges the right of complainant, in this suit, to have a decree entered by the court ordering a sale of the trust property for division among the alleged tenants in common.

We are of the opinion that the bill in the respect now to be considered is without equity, but not on the grounds, or any of them, asserted by the appellees.

We are free to confess that we do not understand the position taken by the complainant with respect to that part, or phase of the bill, which deals with, and undertakes to state, the rights of the appellees growing out of the alleged purchase by Agee, Blackwell, and Bibb of the interest of the beneficiaries, the Jewish Hospital for Consumptives at Denver, Colo., and the Jewish Hospital at Jerusalem. The bill assumes, in fact broadly states, that by said purchase the named purchasers became *"tenants in common in said block with the said John D. Bibb* individually and as trustee of the will of said L. H. Kaplan, and said Kaplan Hospital to be subsequently founded under the direction of said will and in compliance with its terms." We do not understand that the named purchasers acquired by their alleged purchase such a status with reference to said property. It is quite apparent that the meagre averments of the bill in this respect do not show that by their purchase the named parties became tenants in common with any person in the trust property. If Agee, Blackwell, and Bibb did undertake to purchase the interests of the Jewish Hospital for Consumptives at Denver, and of the Jewish Hospital at Jerusalem, the extent of such purchases, for aught disclosed by the bill to the contrary, would be the acquisition of the beneficial interests of said two designated hospitals *and nothing more.* In making their purchase it is not made to appear that the court with jurisdiction of the trust ever gave its sanction and approval thereto.

54

By their purchases said parties did not become tenants in common of the property with the trustee appointed by the court to execute the trust created by the will of said Kaplan. Whatever rights they may have acquired did not, and could not, confer upon them the right of possession, or of control of said property, or of any part of it, nor did they thereby acquire such title or interest as would make them tenants in common with the trustee, who holds the legal title to the entire property, with the duty enjoined upon him to hold the possession of it, and to manage and control the same, to accomplish and effectuate the purposes of the trust. The extent of their right, if it be conceded that the two named hospitals could legally sell their beneficial interests, was the acquisition of the beneficial interest devised to the two named hospitals, and which was to share in the income derived from said property. To hold otherwise would be tantamount to holding that a trust might be dissolved by the act of the beneficiary, although in violation of the plainest terms of the instrument creating the trust, and in utter disregard of the directions of the settlor. The trust created by the will of Mr. Kaplan was an active trust, not a passive one, and by it the legal estate passed to the trustee, to enable him to perform the duties devolved upon him by the donor, and it gave to the cestui que trust only the right in equity to enforce the performance of the trust. 26 R.C.L. p. 1130, § 5.

The bill, in so far as it seeks a sale of the property for partition, cannot be sustained under its averments.

Nor are we impressed that the State, on relation of the Attorney General, suing to correct abuses, can invoke the jurisdiction of the court to sell the trust property for administration purposes. That question should be presented, if ever, by the trustee, under showing, supported by proof that the sale was necessary to carry out the terms of the trust, or that the sale would, by reason of changed conditions, best promote the interest of the intended beneficiary. Code, §§ 10438, 10439.

It appears from the bill that the appellees have taken possession of the trust property, and have assumed the right of controlling the same, and collecting the rents; in short, have been acting as trustees de son tort. The bill contains equity against them, as well as against the said John D. Bibb, for an accounting, and against the said Bibb not only for an accounting, but also for his removal and the appointment of a new trustee.

The court, therefore, was in error in sustaining the joint demurrer of the respondents A. P. Agee, Ellen Agee Foster, Caroline Agee Rowan, Mary Blackwell Wells, J. V. Blackwell, G. B. Blackwell, Louise Blackwell, and Julia Blackwell Patton.

It also appears that the demurrer of the above-named respondents was addressed to the bill as a whole, and for this reason, also, the same should have been overruled, for confessedly the bill contained equity for the purposes above stated, and was without equity only in the phase seeking sale for partition. Wood, et al. v. Estes, 224 Ala. 140, 139 So. 331.

We are of the conclusion that the decree of the circuit court must be reversed for the error committed in sustaining the demurrer of the respondents A. P. Agee, Ellen Agee Foster, Caroline Agee Rowan, Mary Blackwell Wells, J. V. Blackwell, H. B. Blackwell, Louise Blackwell, and Julia Blackwell Patton, and a decree will be here entered overruling the same.

Reversed, rendered, and remanded.

ANDERSON, C. J., and THOMAS and BROWN, JJ., concur.