322 So.2d 688

John C. HENLEY, III

v.

BIRMINGHAM TRUST NATIONAL BANK.

SC 780.

Supreme Court of Alabama.

Aug. 21, 1975.

As Corrected on Denial of Rehearing
Nov. 6, 1975.

Crenshaw & Minor, Montgomery, for appellant.

Macbeth Wagnon, Jr., Birmingham, for appellee.

JONES, Justice.

This is an appeal from a decree of the Circuit Court of Jefferson County entered on a petition filed by Birmingham Trust National Bank (appellee) which prayed for instructions and for ratification of previous acts by BTNB, as co-trustee of a charitable trust. John C. Henley, III (appellant), the other co-trustee, whose cross bill seeking removal of BTNB as co-trustee and other relief was denied, now ap-

peals the order of instructions and ratification given BTNB.

The Trust involved is the Linn-Henley Charitable Trust which was established by the will of Walter E. Henley, the uncle of appellant Henley. Walter Henley was a member of the Board of Directors of BTNB for a period in excess of 50 years and President and Chairman of the Board of the Birmingham Realty Company. The trust corpus consisted almost entirely of stock, one-half of which was BTNB stock. The beneficiaries of the Trust, selected by the co-trustees, are limited to:

". . . any corporation or organization organized and operated exclusively for religious, charitable, scientific, literary or educational purposes . . . whose activities are exclusively within the geographical limits of Jefferson County, Alabama or . . . which maintain branch operations within Jefferson County . . . [but any amounts distributed to the latter] must be expended . . . within Jefferson County . . ."

In the fall of 1968, the management of BTNB decided that it would be advantageous to change its corporate structure from a National Banking Association to that of a "holding company." When this merger was completed, the new structure would consist of a national bank known as the Alabama National Bank, and a Delaware business corporation known as the BTNB Corporation which would own all of the stock of the "new" national bank.

The plan of merger, as governed by the National Banking Act, 12 U.S.C. § 215a, was that the existing bank would be merged into the "new" bank. The "new" bank would not issue stock in the National Banking Association to the shareholders of the "old" bank, but instead would issue one share of stock of the "new" bank directly to the Delaware business corporation in exchange for stock of the existing bank. The Delaware corporation would then issue one share of stock of that corporation for each share of stock in Birmingham Trust National Bank turned in for conversion. When these various steps were completed, each former shareholder of Birmingham Trust National Bank would hold stock of the Delaware business corporation known as BTNB Corporation.

Although over 80% of the stockholders were in favor of this merger, Henley was opposed to it since he felt that from an investment viewpoint the stock of "old" BTNB was more desirable. Thereupon, under authority of 12 U.S.C. § 61(3), which states that in a situation where a national bank and one or more individuals are co-trustees of a trust containing stock of the national bank, the shares of the bank stock may be voted by the individual co-trustee as though he were sole trustee, Henley voted both his personal stock and the Trust's 27,460 shares against the merger, and made extensive remarks in support of his position at the stockholders' meeting. The merger was approved by the Comptroller and became effective on December 31, 1968.

On January 30, 1969, Henley informed BTNB that the Trust was dissenting from the merger. BTNB, to state it mildly, was quite incensed at this course of action pursued by Henley and unsuccessfully attempted to persuade him not to continue with his planned avenue of dissent.

The President of BTNB even arranged a meeting between Henley and one J. Craig Smith, a director of BTNB and Chairman of the Board of Avondale Mills, in the hope that Smith could persuade Henley not to dissent from the merger. It seems that Henley's company, Birmingham Publishing Company, had for some years been responsible for printing the annual reports of Avondale Mills. In fact, one year earlier Birmingham Publishing Company performed over $30,000 worth of services for Avondale Mills. Conspicuously, however, after this meeting with Smith, wherein Henley refused to alter his stand, Birmingham Publishing's business with

Avondale Mills dwindled to $640 two years later.

The statutory procedure for dissent by a stockholder in the present situation is outlined in 12 U.S.C. § 215a(b), (c) and (d). In substance, that procedure is as follows: Those shareholders who are opposed to the merger, as was the Trust, shall be entitled to receive the value of the shares they hold after the merger is approved by giving the receiving association (the "new" bank) notice of such intent at any time before thirty days after the date of consummation of the merger, and by surrendering the stock certificates.

The value of the shares of any dissenting shareholder shall be ascertained by an appraisal made by a committee of three persons, composed of (1) one selected by the vote of the holders of the stock who are dissenting; (2) one selected by the directors of the "new" bank; and (3) one selected by the two so selected.

If, within 90 days of the consummation of the merger, for any reason one or more of the appraisers are not selected, or they fail to determine the value of the shares, the Comptroller, upon written request of any interested party, shall determine the value of the shares which shall be final and binding on all parties. This amount shall be promptly paid to the dissenting shareholders by the "new" bank. Then those shares of the "new" bank which would have gone to the shareholders in exchange for their shares of "old" bank stock, had they not dissented, shall be sold at an advertised public auction. The "new" bank has the right to bid on the "new" stock, and if the price paid at this auction is greater than that paid to the dissenting shareholders, the difference shall be paid to the dissenting shareholders. If the "new" bank is the highest bidder at this auction, it shall resell these shares within 30 days thereafter to such person or persons as it shall desire.

Henley, in compliance with the statute, gave BTNB notice of his intent to dissent and surrendered the shares held by the Trust. Henley appointed one appraiser, though no notice was given to BTNB of such appointment, and BTNB did not appoint anyone to appraise the value of the stock. Neither Henley nor BTNB complied with the 90-day requirement of notifying the Comptroller should the appraisers not be appointed or be unable to agree as to the value of the stock. In fact, Henley never gave notice to the Comptroller and BTNB did not do so until September 23, almost eight months after the merger.

The Comptroller finally did determine the value of the shares of $32.80 a share, for a total of $900,688. Neither co-trustee submitted any pertinent information to the Comptroller which might have aided him in reaching his decision as to the value of the shares.

As required by the statute, BTNB then offered for sale at auction the holding company stock, i. e., the equivalent of the stock of the old bank. The only bid was by BTNB Corporation—the holding company—for $26 per share. Since this bid did not exceed the $32.80 per share previously paid by the dissenting shareholders, no further payment was made by BTNB to the Trust.

In addition to the foregoing transaction, Henley also wished to persuade BTNB to allow the Trust to purchase stock in Birmingham Realty Company. The company, of which Walter Henley was a substantial stockholder, originally owned about 2700 acres where the City of Birmingham is located. It still owns in excess of 200 parcels of real estate in the area.

Henley's argument in favor of purchasing more stock in Birmingham Realty was based on his contention that Walter Henley had in the past discussed with him his desire to bring control of the company to Birmingham from New York. In 1970, about 5% of the outstanding stock in Birmingham Realty came up for sale. If the stock could be acquired, the New York holdings in the company would be reduced

**44**

below 20% and control would then be centered in Birmingham. Henley began negotiations and was told that the stock, with a book value of $900 per share, could be purchased for $650 per share. BTNB refused to agree to the purchase. It was stipulated that the last trade of Birmingham Realty stock before the trial was 5 shares at $1800 per share on May 14, 1973, and that less than 10 shares were offered by the Montgomery office of Sterne, Agee and Leach at a price of $2050 per share.

In April, 1970, Henley demanded further payment by BTNB to the Trust. (Prior to this, BTNB had mistakenly paid $32,952 as dividends on stock of the Delaware Corporation since the Trust no longer owned the stock, and had offered to pay the Trust $28,211 or approximately 6½ % interest on the appraised value of the BTNB stock which it had had the use of for more than a year.) After an extended period of unfruitful negotiations between the two co-trustees, BTNB petitioned the circuit court for instructions and ratification of previous acts.

The issue presented, then, is whether either or both BTNB and Henley, as co-trustees of a charitable trust, are guilty of a breach of their fiduciary duty owed to the Trust as trustees. We find that both are guilty of such a breach.

■ Initially, we would point out, irrespective of Henley's contentions, that we are not here to decide the propriety vel non of BTNB's decision to merge itself from a national banking association to that of a "holding company." This is a decision solely within the discretion of the directors and shareholders of BTNB. As previously noted, the option of dissent was readily available to those who were in disagreement with that decision. Thus, Henley's argument in this respect is without merit.

■ It is a fundamental rule of law that a trustee must act in good faith and display complete loyalty to the interests of his beneficiaries. *First National Bank of Birmingham v. Basham*, 238 Ala. 500, 191 So. 873 (1939); *Barker v. First National Bank of Birmingham*, 20 F.Supp. 185 (D.C., Ala. 1937). It is this duty, in our opinion, that the co-trustees have breached.

The primary error in the decree of the lower court can clearly be seen when it stated:

"There has been no breach of fiduciary duties under the trust by Complainant. By this finding, this Court does not intend to state that there have not been instances, in its part in the execution of the trust, where Complainant has acted unwisely or precipitately. It must have been apparent to Complainant and its trust officers that, from time to time, during the life span of the trust to date, a division of opinion relating to the wisdom or propriety of the execution of the trust affairs was involved as between the co-trustees. When such a division of opinion became apparent, Complainant should have, by proper written petition or even by informal discussions with its co-trustee and this Court, sought, in advance of any direct action on the disputed action, a resolution thereof and a confirmation by a directive of this Court. *But this opportunity and duty was also available to and incumbent upon the co-trustee.* Hereafter, in the management and execution of the trust, the co-trustees are admonished to avail themselves of the services, advice, sanctions and directives of this Court whenever they cannot agree or whenever, even if they do agree, the matter under consideration is of unusual import or complexity." [Emphasis supplied.]

■ The trial Judge was correct when he determined that BTNB should have sought a resolution of this problem in advance of any direct action on its part. *Gilmer v. Gilmer*, 245 Ala. 450, 17 So.2d 529 (1944). The crux of the controversy, however, as found by the Court, is not the relative right or fault of the co-trustees,

but rather the separate and several duties of each to the Trust; and any breach on the part of one co-trustee would certainly not excuse those duties of good faith and loyalty owed by the other co-trustee. After all, charitable trusts are especially favored in equity. *Mastin v. First National Bank of Mobile, Inc.,* 278 Ala. 251, 177 So.2d 808 (1965). Thus, this suit is clearly not concerned with the rights and duties of one co-trustee as opposed to those of the other, but solely with those of the Trust. The principle of contributory or comparative fault or neglect as between co-trustees plays no role in measuring the proper discharge of this high duty imposed by law on each trustee.

█ We will first deal with the breach by both BTNB and Henley in their handling of the Trust's interest in the dissent procedure. Under the outlined procedure of dissent, three appraisers were to be selected. Henley selected one but failed to notify BTNB of such selection and BTNB neglected to select an appraiser at all. Consequently, the third appraiser could not be selected. Additionally, this step not having been complied with, a Comptroller should have been notified within 90 days from the date of the merger. Henley did not give such notice at all, and BTNB did not give it until about eight months after the merger. BTNB attempts to excuse its failure to appoint an appraiser by Henley's failure to notify it of his selection, and that the second procedure of allowing the Comptroller to make the appraisal was always available in lieu of selecting the three appraisers.

These were acts of contest and struggle between the co-trustees and can hardly be said to be acts of good faith and exercises of undivided loyalty on the part of either co-trustee. Every step possible to insure that the Trust assets were protected should have been taken; and it was incumbent upon each to comply with the fiduciary standards required of a trustee irrespective of the default of the other. The default of each is apparent and inexcusable.

█ Henley contends that BTNB should have at least temporarily removed itself as a co-trustee when it was notified of the Trust's decision to dissent from the merger. A conflict of interest was apparent, says Henley, since BTNB was placed in a position whereby on the one hand it had the duty as a co-trustee to see that the Trust received the highest price possible for the stock and, on the other, as the purchaser of the stock, to see that the lowest possible price was paid.

BTNB contends that there was no incumbent duty upon it to resign and that there was no conflict of interest since Henley's decision that the Trust would dissent from the merger forced them into the situation where they became both a seller and a purchaser; also, the dilemma was resolved by the statutory dissent procedure available. With this we cannot agree. Henley did not force BTNB into this situation by merely exercising a legal right in favor of the Trust; but it was the duty of BTNB to recognize the obvious conflict of interest which resulted and resolve it by at least temporarily resigning as trustee.

█ A breach of the co-trustees' duties can be seen in the alternative step of having the Comptroller fix the value of the stock. Neither co-trustee submitted any pertinent information to the Comptroller which might have enabled him to make a more favorable determination of the value of the Trust's BTNB stock. Henley requested annual reports and "internal audits" of BTNB for the five years preceding the merger. The reports were delivered but the "audits" were not. BTNB stated that the audits did not contain any information which would be pertinent to the Comptroller's appraisal of the stock. Henley excuses his failure to submit any information to the Comptroller on BTNB's failure to supply the audit information.

BTNB attempts to excuse its failure to submit information to the Comptroller for two reasons:

First, due to Henley's decision to dissent, he became, for all practical purposes, the sole trustee and thus the duty to submit the information fell on his shoulders and off those of BTNB. (This contention of itself reveals the inherent conflict of interest.)

Secondly, since the Comptroller already possessed extensive information about BTNB as a result of the national bank examination performed two or three times a year, there was no need on their part to submit any additional information. (This virtually admits a default in the discharge of its obligation.)

Again, we cannot agree that the acts or omissions of either co-trustee excused the subsequent breach of duty by the other co-trustee. BTNB and Henley should have each taken the initiative to submit as much information as possible to the Comptroller to enable him to make an accurate appraisal of the stock's value.

▮ Notwithstanding the foregoing. BTNB contends that the Comptroller's appraisal, as stated in 12 U.S.C. § 215a(d), "shall be final and binding on all parties"; and that even if such appraisal was not final and binding, it could only be reviewed by a direct proceeding in which the Comptroller was a party. That is to say, BTNB's contention is that federal law has preempted this entire area of law and that a state court, therefore, is precluded from reviewing the Comptroller's appraisal. Here, again, this contention proceeds on the false premise that the controversy is limited to BTNB and Henley. Moreover, the flaw in this contention is that we are not reviewing the finding of the Comptroller. We are reviewing the acts of the co-trustees, as such acts relate to their fiduciary duties to the Trust, which supervisory jurisdiction has not been preempted by the federal statutes and rests exclusively with the state court.

BTNB contends that, assuming the Comptroller's appraisal was affected by the actions or inactions of either co-trustee, the Comptroller's decision is not subject to review under authority of *Heikkila v. Barber*, 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972 (1953), and *Crane v. Hahlo*, 258 U.S. 142, 42 S.Ct. 214, 66 L.Ed. 514 (1922). Neither case supports such contention.

In *Heikkila*, an alien was deported by order of the Attorney General under authority of § 19(a)[1] of the Immigration Act of 1917, which states that such order "shall be final." Judicial review was proscribed by the very terms of the Act and the complaining parties sought just such a review. The Court recognized habeas corpus, in which issues not administratively adjudicated under the Act could be raised, as the only available remedy.

*Crane* was concerned with the amount of damages awarded in an eminent domain proceeding by the Board of Revision of Assessments in which the statute authorizing such proceeding provided that the award was final and conclusive. Both of these cases deal with efforts to review the merits of previously adjudicated issues expressly contrary to the proscription contained in the Act authorizing the proceedings; and the principle which dictated the result in each case is distinguishable from the case at bar in that the issue before us —the fidelity vel non of a co-trustee—has not been, nor could it have been, adjudicated.

That the preemption doctrine has a field of operation can be seen from the case of *Rogers v. First National Bank of St. George*, 297 F.Supp. 641 (D.C., S.C., 1969), which held that national bank merger procedures are controlled by federal and not state law. The Federal Act does not ad-

---

1. 39 Stat. 889, as amended, 54 Stat. 1238, 8 U.S.C., § 155(a).

dress itself, however, to fiduciary duties,[2] and this is recognized by the final section of the Act which prohibits discrimination in the removal of a merging bank, as a trustee, by a state court on the sole ground that it has availed itself of the merger procedure authorized by the federal banking laws. The federal law cannot preempt that which it does not include nor purport to deal with. The state law is, and necessarily must remain, fully intact with respect to its supervisory jurisdiction of trust estates.

We now turn to Henley's contention that BTNB's refusal to consent to the purchase of Birmingham Realty Company stock for the Trust was premised on consideration for its private interest and not those of the Trust. Credence is given to this contention by the testimony of a BTNB trust officer when he stated:

"I think there were probably two principal disadvantages concerning the substantial ownership of the Trust would have had in Birmingham Realty Company, one would have been that the stock could have been pivotal in perhaps controversial decisions of the corporation, and we do not think that would have been something we would have liked at the time. A number of people who are principals, or who were principals of Birmingham Realty Company at the time or directly interested in the company, were good friends and customers of the Bank, and it could also have been con-

ceivable that a situation would have developed . . . wherein the interest of the Trust would have been adverse to the interest of those individuals, which would have placed the Bank in a situation of where regardless of what we did we might have been criticized for it.

"We do not think that owning that much stock of the company would have been desirable, principally for those reasons."

■ As stated in *Barker v. First National Bank of Birmingham,* supra, when referring to the duties of a trustee, "all personal or selfish interests and all consideration of the interests of third parties must be excluded. His must be an undivided loyalty."[3]

■ Clearly, if the foregoing statement is the true reason for BTNB's refusal to purchase the stock, then it has committed a definite breach of its fiduciary duty.

BTNB asserts that its reasons for refusing to purchase the Birmingham Realty stock are as follows:

1) The purchase would concentrate too much of the Trust's assets in a closely held corporation.

2) The stock provided low income which might prove troublesome under the Tax Reform Act of 1969.

2. The reference here to "fiduciary duties" is to be understood in the context of the law of trusts; the reference is not to those duties owed by a bank to its dissenting stockholders absent the trustee relationship. Indeed, as to ordinary stockholders who dissent from the merger, the Federal Act contemplates that a bank is cast in an adversary role—a role abhorred by the law of trusts.

3. Justice Cardozo, speaking for the majority in *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928), said: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of

the market place. Not honestly alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. *Wendt v. Fischer,* 243 N.Y. 439, 444, 154 N.E. 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." See also *United States v. Missisippi Valley Generating Co.,* 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961).

3) Since it was a closely held company, the stock would be difficult to sell.

4) The value of the stock would be difficult to determine.

5) Owning this much stock would make the Trust influential in company affairs, perhaps pivotal in conflicts among the controlling shareholders, and would create a situation wherein conflict between the co-trustees might be encouraged.

6) There was no proof in the will that Walter E. Henley desired for the Trust to make such a purchase.

7) The purchase would have no relation to the avowed charitable purpose of the Trust, and

8) If the Trust were allowed to purchase the stock, then Henley and his cousin, Carl Wittichen, already a substantial stockholder of Birmingham Realty Company, would then effectively control 18% of Birmingham Realty Company.

When taken together, and fully analyzed, these reasons are but supportive of the conclusions stated in the trust officer's testimony and demonstrate the legal conclusiveness of the conflict of interest on behalf of BTNB with respect to this transaction.

■ Next, BTNB contends that, assuming some breach of duty on their part, no evidence was adduced showing that any damage to the Trust resulted therefrom. Indeed, the anomaly encountered in obtaining any "after the fact" remedy on behalf of the Trust is readily apparent. The bank stock, the value of which is the principal asset involved, is gone. So is the Birmingham Realty stock. But the difficulty of ascertaining the loss, if any, suffered by the Trust can never be a legal ground for ratification of such flagrant abuse of fiduciary duties by the co-trustee. If difficulty of solution were the basis for denying a remedy, hardly any field of operation would exist for the equity arm of the Court.

■ We recognize that our remand of this cause with instructions for resubmission of the issue of damages to the Trust, if any, places on the trial court a responsibility which would not have arisen had there been a good faith utilization of the procedure set out in the Federal Act with regard to placing a value on the bank stock. But, here again, federal law contemplates faithful discharge of fiduciary duties, and does not speak to fiduciary accountability. Therefore, the guilty trustee cannot be heard to complain that its misconduct invites, with its attendant risks, a state court review and determination of liability for damages, if any, to the Trust. As we have previously observed, state courts exercising supervisory jurisdiction over trusts provide the only available forum for such review and determination.

■ This case is remanded to the trial Court with the following instructions:

1. Appoint a Temporary Trustee of the Trust Estate in lieu of the named co-trustees for the sole and limited purpose of the retrial of this cause.

2. Upon resubmission of this cause, make the following specific findings of fact and conclusions:

(a) Determine what data should, and except for the conflict of interests of the co-trustee—BTNB—would, have been made available to the Comptroller; and, from such data, fix the value of the "old" bank stock as of the time such ascertainment is contemplated by the Federal Act. If the value as fixed is more than the value fixed by the Comptroller, award to the Trust as damages the sum equal to the difference against BTNB.

(b) In which latter event (if the fixed value per share exceeds $32.80), de-

termine the true bid value of the "new" bank stock had BTNB, absent its conflict of interests, actively sought potential bidders as of the time of the public auction as provided by the Federal Act. If the bid value so fixed is higher than the ascertained value of the stock as fixed under (a) above, award to the Trust as additional damages the sum equal to such difference against BTNB.

(c) If the ascertained value of the "old" bank stock is less than $32.80 per share, but the per share auction value as fixed under (b) above exceeds $32.80, award to the Trust as damages the sum equal to the aggregate of the difference between such per share auction value and $32.80 against BTNB.

It is suggested that the price obtained by BTNB upon resale of the "new" stock within the 30-day period following the auction, as prescribed by § 215a(d), is relevant data (subject, of course, to any admissible evidence of price variance) for consideration in making such determination.

(d) Determine whether the ascertainable true value of Birmingham Realty stock and the asking price therefor of the "N. Y. block," along with the other material factors, rendered BTNB's conflict of interests responsible for an abuse of discretion in refusing to agree to such purchase. If so, award to the Trust as damages such sum as the Court may deem reasonable and adequate to make the Trust whole in light of all competent evidence adduced on this issue.

(e) Determine whether BTNB's evidenced conflict of interests is so inherent in the nature of its relationship to the Trust and to the Co-trustee Henley as to render BTNB dis-

qualified to further serve as co-trustee to the instant Trust Estate; or, whether the resolution of the instant controversy will so dissolve the conflict of interests as to render BTNB fully competent and qualified to serve as co-trustee; and to implement by order of the Court such determination as the interest of the Trust Estate may require.

3. Determination and award of expenses and fees chargeable against the Trust Estate shall be limited to those reasonably and necessarily incurred by the Temporary Trustee and his attorney.

In conclusion, we observe that the Attorney General of the State of Alabama was made a party to this litigation as authorized by *State v. Bibb*, 234 Ala. 46, 173 So. 74 (1937). The record shows that the Attorney General filed an answer requesting in effect that the Court protect the interests of the beneficiaries to the charitable Trust. Except for one apologetic reference made by the trial Judge to his failure to recognize the representative from the Attorney General's office for the purpose of examining a witness, the record is moot as to any participation by the Attorney General in the trial of this cause. The wisdom of *Bibb*, authorizing representation of the beneficiaries of a charitable trust by the Attorney General, is abundantly exemplified by the posture of the record in this case. We have noted this fact merely to comment that we deem appropriate the active participation by the office of the Attorney General on behalf of the beneficiaries of the Trust Estate upon retrial of this cause.

Reversed and remanded with instructions.

MERRILL, ALMON, and EMBRY, JJ., concur.

SHORES, J., concurs in the result.

HEFLIN, C. J., and MADDOZ, J., dissent.

BLOODWORTH and FAULKNER, JJ., not sitting.

MADDOX, Justice, (dissenting).

Everyone seems to agree that this is a unique case, but as I view it, there is just one legal question—what is the duty of a national bank in consolidation or merger proceedings, when the bank is co-trustee of a charitable trust, and a major asset of the trust is the stock of the bank?

The majority opinion sets out the facts and I shall not restate them, but I do list a few of the basic points for a better understanding of my dissent. This charitable trust was established by the late Walter Henley who was a director, a president and later chairman of the board of Birmingham Trust National Bank, one of the co-trustees. This controversy arose when BTNB decided to merge into a holding company. The other co-trustee, John C. Henley, III, was opposed to the merger.

In this proceeding, the trial judge, after hearing extensive testimony, did not find that the bank had been disloyal to the trust, although he did point out that the bank and Henley should have received instructions in advance. The attorney general, representing the beneficiaries of the ·charitable trust, does not question the trial court's finding of no disloyalty on the part of BTNB.

My dissent is based on these basic points:

1. Under the facts of this case, I find no prejudicial error in the trial court's determination that the bank was not disloyal;

2. The conduct of fiduciary business by BTNB, a national bank, was governed by federal law and regulation;

3. Since there was no cross-appeal, I believe this Court exceeds its appellate jurisdiction when it finds that co-trustee Henley was also disloyal;

4. I question whether, on the record before us, this Court should direct the attorney general in the exercise of what, normally, is considered to be his executive discretion.

First, let me point out that I believe that the majority has acted in good faith, and that they sincerely believe, as indeed they find, that both Henley and BTNB were disloyal to this trust. I believe, however, that the majority has made an inflexible application of the conflict of interest rule, which I believe is not suitable in this case. Furthermore, the majority has specifically failed to apply the principle that the conduct of fiduciary business by national banks is governed, significantly, by federal laws and regulations.

### *The bank acted in good faith.*

The trial judge determined that the bank acted in good faith. There is substantial evidence to support this finding, and I believe that this finding of no disloyalty is very important to a decision in this case.

Nobody can quarrel with the fundamental rule of law, stated in the majority opinion, that a trustee must act in *good faith* and give *undivided loyalty* to his trust. *First National Bank of Birmingham v. Basham*, 238 Ala. 500, 191 So. 873 (1939).

Unquestionably, if a trustee has engaged in self-dealing, as a matter of public policy, and because of the temptation of wrongdoing, the cestui que trust (the attorney general represented them in this case) may elect to affirm or disaffirm, unless countervailing equities have intervened. Whether the trust estate sustained a loss or profited is of no consequence. The *Basham* case also says that the primary consideration is the *good faith* of the trustee. In *Basham*, the trial court had surcharged the trustee. This Court reversed

and remanded the case, saying at one point:

"Banks, authorized by law to engage in a trust business, owe the same fidelity, and are subject to the same rules governing individual trustees, when applicable on principle.

"A distinction must be drawn between transactions wherein the interest of the bank and the trusts in its keeping are in common, as where the acts of the bank are in aid of such trusts, and transactions wherein their interests are antagonistic. Statutes conferring upon State or National Banks the power to engage in a trust business are designed to make available to investors the facilities and the experiences of Bankers in making investments, safeguarding the trusts by setting up trust departments, directly engaged in the handling of trusts, and keeping complete records of trust transactions relating to each trust, subject to examination by the supervising agencies of government."

A close reading of the *Basham* case indicates to me that this Court recognized in that case that even if a conflict of interest may seem to exist, the *good faith* of the trustee is the critical question.

The majority also cites *Barker v. First National Bank of Birmingham,* 20 F.Supp. 185 (D.C.Ala.1937), in support of their position that BTNB was disloyal. I believe the majority has failed to read what this Court said about the *Barker* case in *Basham,* as follows:

"Such dealings are challenged as violation of the rule of undivided loyalty to each trust. If the trustee has no personal interest to serve, there is nothing inherent in such transaction inconsistent with full loyalty to both; may do both a good service. We do not concur with the views expressed in *Barker v. First Nat. Bank of Birmingham,* D.C., 20 F. Supp. 185, 190, to the effect that loyalty to the selling trust in such case demands

a sale at the highest obtainable price, and loyalty to the buyer demands a purchase at the lowest price. One of the criticisms of participations is that the market therefor is limited to the family of trusts. It would be a severe rule to charge a trustee with a breach of trust toward the seller where he has obtained the full amount he would have received if he had collected the loan at the time, or a breach of trust toward the buyer who gets a good loan on like terms he would have gotten on a new mortgage, and without the expense of negotiating and closing a new loan.

"We concur in the Restatement, supra, to the effect that when challenged as unfair, resulting in loss to the buyer, *the burden is on the trustee to show the transaction was in good faith, and in the exercise of sound discretion and prudence in making this, as any other investment.*" (Emphasis added.)

In *Barker,* the federal district court had criticized the bank on an inter-trust sale of a mortage participation, but did not surcharge the trustee which acted in good faith.

I believe that Alabama follows the rule, advocated by many legal writers, that when conflicts of interest cases involving corporate trustees arise, they should be approached in light of the remoteness of the conflict and the presence or absence of good faith. see, Prochnow, *Conflict of Interest and the Corporate Trustee,* 22 Bus. Law, 929 (1967); Comments, *Corporate Trustee's Conflict of Interest,* 25 U.Chi.L. Rev. 382 (1958). The writer of the University of Chicago Comment thinks both *Basham* and *Barker* suggest "the use of good faith as a defense" in a conflicts of interest case. It has also been suggested that almost every trustee is subject to some degree of divided loyalty. Niles, *The Divided Loyalty Rule,* 91 Trusts and Estates, 734 (1952). Niles states the most common disloyalty is for a trustee to conduct him-

self so that he can be safe from any criticism.

The problem I have with the majority opinion is that I do not think the opinion recognizes the use of good faith as a defense in a conflict of interest case. Even if I did not think that this Court had recognized good faith as a defense in a conflict of interest case, I believe the settlor of this particular trust recognized that, on occasion, one or both of the trustees might have an "adverse interest." The only limitation he made was that each trustee should not exercise any power or discretion for the "personal advantage of the trustees." The specific trust clause provides:

"In the management and control of the trust estate, the Trustees may (*irrespective of the adverse interest of any Trustee*) do and have done with respect to the trust estate and every part thereof all things which in the sole judgment and discretion of the Trustees may seem necessary, desirable or proper to promote, protect or conserve the interests thereof and of the beneficiaries thereof, in like manner as if the Trustees were entitled to said property beneficially, and every determination of the Trustees in the construction of powers or in any matter with respect to which the Trustees may be empowered to act or exercise discretion hereunder, whether made upon a question formally or actually raised or implied in any act or proceeding of the Trustees in relation to the premises, shall be binding upon all persons interested in the trust estate and shall not be objected to or questioned on any grounds whatsoever. Powers and discretion, however, are vested in the Trustees as fiduciaries in the interest of the trust estate and its beneficiaries and not for the personal advantage of the Trustees." (Emphasis added.)

As I read this clause, the trustees could act, "irrespective of the adverse interest" of either of them, but they must act in good faith for the best interest of the trust. Now, there was a difference of opinion between the co-trustees about whether the merger was in the best interest of the trust. If both trustees acted in good faith, thinking their independent judgments were in the best interest of the trust, why is that a breach of trust? Is it not possible that the bank's business judgment concerning what was good for the bank would also be good for the trust, especially since a substantial asset in the trust was the bank stock?

In *Basham*, this Court seems to approve of transactions where the interests of a trustee coincides with those of the trust, assuming, of course, the presence of good faith:

"Since the trustee has the clear right to deposit such funds in a good and solvent bank, there is no reason, nor legislative policy, to require deposit in a bank other than that selected by the settler to handle trust funds althought the trustee bank, like any other bank, would hold them as available assets for loans on its own account. See, also, *Robinson v. Williams, Superintendent*, 229 Ala. 692, 159 So. 239. National Banks are required to deposit securities for the protection of such funds. 12 U.S.C.A. § 248(k).

"As a business proposition, such deposits may enable the trustee to do a good service to the trust estates at less expense.

"All this is to demonstrate the policy of our laws in disapproving transactions by such trustees where the personal interest of the trustee is at variance with the interest of those whom he represents in trust relations; *and to uphold transactions in the common interest of the trustee and trust estates in his keeping.* Equity rules are to be applied in recognition of this policy, and deal with realities, not matters of form merely." (Emphasis added.)

Since the trial court found the bank was not disloyal, I believe that this finding, under Alabama law and under the terms of the trust instrument, was a defense against the "conflict of interest" charge.

### The conduct of fiduciary business by a national bank is governed by federal law and regulations.

Under the facts of this case, what federal law was applicable? Let's examine the facts and apply the law. The management of the bank had decided to consolidate. Since the bank held shares of its own stock as trustee, it could not vote the shares in the consolidation proceeding, because Tit. 12, § 61, U.S.C., prohibited it from voting these trust shares. That section provides, in part:

"In all elections of directors, each shareholder shall have the right to vote the number of shares owned by him for as many persons as there are directors to be elected, or to cumulate such shares and give one candidate as many votes as the number of directors multiplied by the number of his shares shall equal, or to distribute them on the same principle among as many candidates as he shall think fit; *and in deciding all other questions at meetings of shareholders, each shareholder shall be entitled to one vote on each share of stock held by him*; * * * and (3) shares of its own stock held by a national bank and one or more persons as trustees may be voted by such other person or persons, as trustees, *in the same manner as if he or they were the sole trustee*. * * * Whenever shares of stock cannot be voted by reason of being held by the bank as sole trustee such shares shall be excluded in determining whether matters voted upon by the shareholders were adopted by the requisite percentage of shares." (Emphasis added.)

As I read this statute, when the question of merger came up, this section prohibited the bank from voting the trust stock.

However, the statute specifically permitted Henley, as co-trustee, to vote this stock. Henley, acting under this statute, actually voted every share of the trust stock *against* the merger, as he had a legal right to do acting as he was under the statute as the "sole trustee." A reading of Tit. 12, § 61, convinces me that when a national bank holds shares of its own stock as sole trustee, it cannot vote the stock and these shares are excluded in determining whether matters voted upon by the shareholders were adopted by the requisite percentage of shares. I believe this portion of Tit. 12, § 61, U.S.C., was added by Congress to the National Banking Act in 1966 to prevent an inequity. If shares so held by a bank in trust could not be voted, and were not excluded, voting rights belonging to the beneficiaries of the trust would, in effect, be given to the remaining shareholders. cf. *Cleveland Trust Co. v. Eaton,* 21 Ohio St. 2d 129, 256 N.E.2d 198 (1970). When shares of its own stock are held by a national bank and one or more persons as trustees, then the other person or persons may vote the stock in the same manner as if he or they were the *sole trustee.*

Henley, acting as *sole trustee,* became a *dissenting shareholder,* pursuant to federal law. The critical question at this point was: what duty did the bank have with regard to the trust? The majority seems to say, in effect, that the bank should have supported Henley's dissent even though it was against its business judgment. I disagree. Federal law prohibited the bank from *voting* the stock. Was the bank under a duty to support Henley's dissent, even though it, acting in good faith, thought his dissent was not in the best interest of the trust? I think not. If Henley had not dissented, the BTNB stock would have been exchanged for the "new" bank stock. Does the bank fail to give undivided loyalty to the trust by disagreeing with a business judgment exercised by a co-trustee, who is statutorily empowered to vote the shares as a "sole trustee?" I think not. I believe that federal law sufficiently

protected this trust but even if I did not think that, I believe that this Court should consider this case in the light of the finding by the trial court of an absence of bad faith on the part of the bank.

In any event, when Henley decided to dissent, I believe that he became a "dissenting stockholder" under the provisions of federal law and from that point forward, national law provided, in detail, the procedure which had to be followed to determine the value of the shares. Tit. 12, § 215(b), U.S.C., provides, in part, that when a shareholder dissents from a plan of consolidation, he "shall be entitled to receive the value of the shares so held by him when such consolidation is approved by the Comptroller * * *." The valuation of the shares is governed by national law. Tit. 12, § 215(c) provides:

### *"Valuation of Shares*

"(c) The value of the shares of any dissenting shareholder shall be ascertained, as of the effective date of the consolidation, by an appraisal made by a committee of three persons, composed of (1) one selected by the vote of the holders of the majority of the stock, the owners of which are entitled to payment in cash; (2) one selected by the directors of the consolidated banking association; and (3) one selected by the two so selected. The valuation agreed upon by any two of the three appraisers shall govern. If the value so fixed shall not be satisfactory to any dissenting shareholder who has requested payment, that shareholder may, within five days after being notified of the appraised value of his shares, appeal to the Comptroller, who shall cause a reappraisal to be made which shall be final and binding as to the value of the shares of the appellant.

*Appraisal by Comptroller; expenses of consolidated association; sale and resale of shares; State appraisal and consolidation law.*

"(d) If, within ninety days from the date of consummation of the consolidation, for any reason one or more of the appraisers is not selected as herein provided, or the appraisers fail to determine the value of such shares, the Comptroller shall upon written request of any interested party cause an appraisal to be made *which shall be final and binding on all parties.* The expenses of the Comptroller in making the reappraisal or the appraisal, as the case may be, shall be paid by the consolidated banking association. The value of the shares ascertained shall be promptly paid to the dissenting shareholders by the consolidated banking association. Within thirty days after payment has been made to all dissenting shareholders as provided for in this section the shares of stock of the consolidated banking association which would have been delivered to such dissenting shareholders had they not requested payment shall be sold by the *consolidated banking association at an advertised public auction, unless some other method of sale is approved by the Comptroller, and the consolidated banking association shall have the right to purchase any of such shares at such public auction, if it is the highest bidder therefor, for the purpose of reselling such shares within thirty days thereafter to such person or persons and at such price not less than par as its board of directors by resolution may determine.* If the shares are sold at public auction at a price greater than the amount paid to the dissenting shareholders the excess in such sale price shall be paid to such shareholders. The appraisal of such shares of stock in any State bank shall be determined in the manner prescribed by the law of the State in such

cases, rather than as provided in this section, if such provision is made in the State law; and no such consolidation shall be in contravention of the law of the State under which such bank is incorporated. (Emphasis added.)

As I read the majority opinion, it does not say that the bank failed to follow the procedure outlined in the national banking laws and regulations. Procedurally, the bank did nothing that was not allowed under national banking laws in consolidation proceedings involving dissenting shareholders. Even Professor Scott, who has been accused of developing the stringent conflict of interest rule [see, Notes and Comments: *Trusts: The Rule of Undivided Loyalty—Corporate trustees holding their own shares,* 33 Cornell L.Q. 616 (1948), agrees that this is true. He says:

"Corporate trustees are subject to many regulations which are inapplicable to individual trustees. Thus the trust departments of state banks and trust companies are subject to the supervision of the banking authorities of the state. Frequently there is legislation regulating the duties of corporate trustees and the method of their conduct of trust business. The conduct of fiduciary business by national banks is governed by the Federal Reserve Act, § 11(k), and by Regulations issued in pursuance of the Act. Regulation F of the Board of Governors of the Federal Reserve system is now superseded by Regulation 9 of the Comptroller of the Currency.

"Although a state which permits trust companies or banks to act as fiduciaries cannot prevent national banks within the state from exercising fiduciary powers, a national bank acting as trustee is subject to the laws of the state, except insofar as these laws may conflict with federal laws or regulations or interfere with the purpose of Congress in permitting national banks to exercise fiduciary powers."

Of course, federal law would not protect self-dealing, and for that matter, neither would Alabama law, where the personal interest of a trustee is at variance with the interest of those whom he represents in trust relations. As I read the federal law, it is designed to prevent conflicts of interest when a bank trustee holds shares of its own stock in trust. I believe that a trustee bank which follows federal regulations, in good faith, could not be guilty of a breach of trust. In other words, when a national bank acts pursuant to federal law in merger proceedings, without disloyalty to the trust, as the trial court found in this case, then I believe that this Court could not remove a national bank as trustee so long as it was acting in good faith in following federal laws and regulations. [*cf. First National Bank v. Fellows,* 244 U.S. 416, 37 S.Ct. 734, 61 L.Ed. 1233 (1917)]

### *Court decides question not raised.*

I believe the Court exceeds its appellate jurisdiction when it decides that Henley was also disloyal. The trial court entered no judgment on this issue. In the absence of a finding of bad faith by the trial court, I would not reach this issue. This Court's finding of disloyalty by Henley raises serious questions. Could the Attorney General, or should he, in view of the suggestion given in the majority opinion that he should actively participate, file proceedings against Henley for surcharge?

It appears to me that Henley, under the trust instrument, had the same powers and duties BTNB had. I would apply the same principles of law to Henley's actions as I would to BTNB's—that is, if that were before me. I believe that with regard to the purchase by the trust of the Birmingham Realty Company stock, the trial court has not found BTNB disloyal. The trial judge made no finding with regard to whether Henley was acting in good faith and in the best interest of the trust or for his own personal advantage in this matter. I fail to find in the record before us that Henley's

**56**

loyalty was made an issue at the trial level. Consequently, I fail to see how this Court can reach it. Furthermore, to find Henley guilty of a breach of trust without allowing him an opportunity to defend raises serious due process questions.

*This Court cannot direct the exercise of an act of executive discretion.*

The attorney general appeared in this proceeding, at the beginning of the trial with three attorneys, but took little active interest except to ask the court to protect the beneficiaries of the trust. I question whether this Court should suggest to the Attorney General how he must represent the beneficiaries of this trust. He is a constitutional officer and is vested with executive discretion.

*Summary*

The effect of the majority decision, I fear, means that every bank which is serving as a sole trustee or as a co-trustee of a trust containing shares of its own stock, would have to, at least temporarily, remove itself during the course of every consolidation proceeding. I cannot believe this is the law. In short, I think the matter of self-dealing and consolidation, are dealt with by federal law and by regulations promulgated by the comptroller of the currency. See, 12 C.F.R., § 9.12. I believe that when a trustee bank acts in good faith, and follows the procedures required by federal law, this Court should not find that the trustee bank breached its duty. In other words, it would seem to me that when an individual co-trustee decides to exercise rights granted to him by federal law "in a manner as if he or they were the sole trustee," the co-trustee, acting as the sole trustee, must bear the commensurate responsibilities of a sole trustee. If the bank had been sole trustee, the bank shares would have been excluded in determining whether the other shareholders voted for or against merger by the required percentage.

The principles I would apply would seem to be especially true in this case, since we are dealing with a charitable trust. Section 383, Restatement of Trusts 2d, provides that if there are several trustees of a charitable trust, the powers conferred on them can properly be exercised by a majority of the trustees, unless it is otherwise provided by the terms of the trust. In other words, in this case, federal law permitted the co-trustee of this charitable trust to exercise the powers which had been initially conferred upon the co-trustees. Henley decided to dissent from the merger. I cannot say whether his judgment was good or bad. I do believe, however, that under the trust instrument in this case, both trustees had the power and discretion to act, irrespective of their adverse interests, so long as they exercised their powers and discretions in the best interest of the trust. *First National Bank of Birmingham v. Basham,* supra.

When Henley dissented and the bank was put in a conflict of interest position, under federal law, Alabama law, and the terms of the trust instrument, the bank had to exercise good faith. The trial court found the bank was not disloyal, as a matter of fact.

In view of the above, I would affirm the judgment of the trial court which found that the bank was not disloyal to the trust.

HEFLIN, Chief Justice (dissenting):

While I don't completely agree with all the language and all of the conclusions of law contained in Justice Maddox' dissenting opinion, I am in general agreement with it.

In my opinion, the Congress of the United States anticipated the problems which arose in this case. Congress anticipated that conflicts of interest could easily arise between a bank trustee and an individual co-trustee and that charges and countercharges of disloyalty to the trust and its beneficiaries could be present in a merger

reorganization of a *national* bank where the trust held stock in that bank. Therefore, Congress provided procedures to meet the anticipated problems, including the valuation of bank stock held by a trust of which the merging bank was one of the trustees.

After reviewing the majority opinion I have concluded that the majority finds that the only real breach of BTNB's trust duties involved in the merger reorganization was that BTNB breached its fiduciary relationship in failing to submit valuation data to the Comptroller of the Currency. Since an appraisal was made by the comptroller and public auctions of the stock were held, strict compliance with the requirements concerning the appointment of the three appraisers and with other preliminary steps was made moot. My colleagues of the majority fail to realize that Congress placed a duty on the comptroller to make the appraisal of the value of the stock. The choice of the comptroller to make the appraisal was not by chance. Who else other than the comptroller would have access to all of the records of the bank and the authority to demand and acquire information which might affect valuations?

In my judgment, Congress intended that the federal law would preempt the state law as to the details and the procedure of a merger of a *national* bank, including the procedure of determining the value of the stock of a dissenting trust of which the merging bank was one of the trustees. If not, why did Congress specify such a detailed and protective procedure? See *Rogers v. First National Bank of St. George,* 297 F.Supp. 641 (D.S.C.), aff'd 410 F.2d 579 (4th Cir. 1969).

The majority cites one other breach of the bank-trustee's responsibility—the failure to buy stock in a corporation when the individual co-trustee recommends the purchase.

The bank in this instance gave many valid reasons why stock in the Birmingham Realty Company should not be purchased.

The trial court heard the evidence ore tenus. I do not find from the evidence that the decision of the trial court was plainly erroneous or manifestly unjust. *Kubiszyn v. Bradley,* 292 Ala. 570, 298 So.2d 9 (1974). In *Dougherty v. Gulf Shores Motel,* 292 Ala. 252, 254, 292 So.2d 454, 456 (1974), this court said:

"Where the evidence is heard orally before the trial court, the finding of the court has the effect of a jury's verdict and will not be disturbed on appeal unless plainly erroneous. And we must affirm the trial court's decree if fairly supported by credible evidence under any reasonable aspect, regardless of what might be our view of the evidence. *Lott v. Keith,* 286 Ala. 431, 241 So.2d 104; *Norton v. Norton,* 280 Ala. 307, 193 So. 2d 750."

It is difficult to understand how the majority of this court can reach the issue of a breach of trust duties by John C. Henley, III, the individual co-trustee. The trial court didn't mention any such breach in its decree. There is no urging by cross appeal or otherwise from any party to this cause that this court should make such a finding.

I am in agreement with Justice Maddox in his treatment of the Attorney General issue.

I would affirm the decree of the trial court.

### ON REHEARING

JONES, Justice.

Opinion corrected.

Application for rehearing overruled.

MERRILL, ALMON, and EMBRY, JJ., concur.

SHORES, J., concurs in the result.

HEFLIN, C. J., and MADDOX, J., dissent.

BLOODWORTH and FAULKNER, JJ., not sitting.