371 So.2d 883 (1979)
BIRMINGHAM TRUST NATIONAL BANK et al.
v.
John C. HENLEY, III, et al.
Charles A. GRADDICK, Attorney General
v.
BIRMINGHAM TRUST NATIONAL BANK et al.
John C. HENLEY, III
v.
BIRMINGHAM TRUST NATIONAL BANK et al.
77-382, 77-382A and 77-382B.
Supreme Court of Alabama.
April 6, 1979.
Rehearing Denied June 8, 1979.
*884 Lee C. Bradley, Jr. and Macbeth Wagnon, Jr., Birmingham, for Birmingham Trust National Bank and Southern Bancorporation of Ala., appellants and cross-appellees.
Donald B. Sweeney, Jr., Birmingham, for Individual Co-Trustee John C. Henley, III, appellee and cross-appellant.
Charles A. Graddick, Atty. Gen., Montgomery, appellee and cross-appellant, for beneficiaries of the trust; James L. O'Kelley, Asst. Atty. Gen., Birmingham, on the brief.
Morris K. Sirote of Sirote, Permutt, Friend, Friedman, Held & Apolinsky, Birmingham, for Jack H. Harrison, appellee, as temporary trustee of the Linn-Henley Charitable Trust.
SHORES, Justice.
This is the second appeal in this case. See Henley v. Birmingham Trust National Bank, 295 Ala. 38, 322 So.2d 688 (1975).
For convenience, we reiterate the salient facts:
The Linn-Henley Charitable Trust was created by the will of Walter E. Henley, a former president and chairman of Birmingham Trust National Bank (BTNB), who died in December, 1961. His will named BTNB, or its successors, and his nephew John C. Henley, III, joint executors of his will and joint trustees of the Trust. BTNB and Mr. Henley served as joint executors from December, 1961, until July, 1965, when administration of the estate was terminated. The executors were then discharged following a final accounting and the Trust was funded. BTNB and Mr. Henley continued serving as joint trustees of the Trust down to the present. Potential beneficiaries of the Trust, to be selected by the joint trustees, are limited to:

*885 "... any corporation or organization organized and operated exclusively for religious, charitable, scientific, literary or educational purposes ...
"...
"... whose activities are exclusively within the geographical limits of Jefferson County, Alabama, or ... which maintain branch operations within Jefferson County [but any amounts distributed to the latter] ... must be expended ... within Jefferson County ..."
Assets of the estate of Walter E. Henley consisted almost entirely of bank stocks, a major portion of which was stock of BTNB. These stocks became the initial "inherited" assets of the Trust. As a result of various splits and dividends, the Trust owned 27,460 shares of BTNB stock in 1968.
In the fall of 1968, management of BTNB decided to form a one-bank holding company. The reorganization plan involved (a) formation of a new national bank, 100% of the stock of which was held by a Delaware business corporation, also newly formed, and (b) merger of the existing bank into the newly formed bank with the holding company issuing its stock, in a one-for-one exchange, to replace stock of the existing bank. The merger phase of the reorganization plan was governed by provisions of the National Bank Act, 12 U.S.C. § 215a. One effect of this method of reorganization was that all stock of the surviving national bank (except directors' qualifying shares) would be owned by the holding company and the only stock available to the public would be stock of the holding company.
A stockholder vote was held on November 19, 1968, resulting in approval of the proposed reorganization by holders of more than 80% of the outstanding stock of the old bank. The Comptroller of the Currency (the federal official charged with supervision of national banks) gave his approval on November 25, 1968. The reorganization became effective December 31, 1968.
Henley opposed the merger/reorganization and decided it would be in the interest of the Trust to have the Trust dissent from the merger. The rights of dissenting stockholders are contained in the provisions of 12 U.S.C. § 215a, supra. Basically, the dissent procedure calls for surrender of the stockholders' shares followed by an appraisal to determine their value. There is provision for the parties to appoint appraisers but, if for any reason the appraisal is not completed within 90 days, either party may call on the Comptroller to appraise the stock surrendered by the dissenter. The statute provides that the Comptroller's appraisal shall be final and binding on all parties. The national bank that survives the merger is required to pay dissenters for their stock at the appraised value. The final step in the dissent process requires the continuing national bank to sell at public auction the stock which would have been delivered to the dissenting stockholders had they not dissented. The continuing bank is expressly permitted to buy the stock offered at this auction but, if it does, it must dispose of the stock in some manner within 30 days. If the auction sale of the stock "that would have been delivered" brings more than the appraised value of the shares surrendered, the excess over the appraised value is paid to the dissenters.
No appraisal having been theretofore accomplished, BTNB, on September 23, 1969, wrote to the Comptroller asking him to appraise the stock of the Trust that had been surrendered in connection with the dissent.
On January 21, 1970, the Comptroller reported his appraisal, finding that, at the effective date of the merger, which was December 31, 1968, the stock of "old" BTNB had a value of $32.80 per share, making a total value of $900,688 for the 27,460 shares. This amount was paid by the "new" BTNB to the Trust and accepted by Mr. Henley on behalf of the Trust. The "old" BTNB stock was surrendered at this time. This appraisal by the Comptroller was somewhat above the market. The market price on December 31, 1968, was 30 bid, 31 asked. In the trial it was accepted that the market price was 30½.
*886 After making this payment, BTNB proceeded to hold an auction sale, as required by 12 U.S.C. § 215a(d). With the approval of the Comptroller, the Bank first advertised an auction for 27,460 shares of the holding company stock, to be held on February 10, 1970. Shortly before the date advertised for this sale, Henley objected, pointing out that 12 U.S.C. § 215a(d), supra, required that stock of the "receiving association" be offered at auction and contending that this meant the stock of the continuing national bank. Before the first auction, Mr. Henley delivered to one of the trust officers of the bank a letter in which he said:
"... Inasmuch as there is in my opinion a real likelihood that the proposed sale will not attract bids in line with the true value of the stock, I invite the Birmingham Trust National Bank as Co-Trustee for the Linn-Henley Charitable Trust to join me in bidding at the sale and to purchase as many shares of common stock of BTNB Corporation as can be purchased at a price not exceeding $23.25 per share, the last quoted bid price for such stock. ... You are in a unique position to know the value of the BTNB Corporation stock offered for sale and I believe you would agree that if the same can be purchased for $23.25 or less per share it would be a good investment for the Trust. ..." (Emphasis Added)
The Bank declined to join Henley in purchasing or bidding for the holding company stock on behalf of the Trust. The only bid for the stock offered was made by the holding company. It purchased 27,460 shares of its own stock at $26 per share.
Being uncertain that the proper stock had been auctioned to satisfy 12 U.S.C. § 215a(d), supra, BTNB held a second auction, at which 27,460 shares of the continuing national bank were advertised and sold on March 6, 1970. Again, the only bid was made by the holding company, this time at $24 per share. Since neither auction produced a bid in excess of $32.80 per share, there was no further payment by BTNB to the Trust as a result of these auctions (12 U.S.C. § 215a(d), supra)
On the first appeal, Henley contended that BTNB had breached its duty to the Trust in several respects. A plurality of this court concurred to reverse the cause to the trial court to:
"1. Appoint a Temporary Trustee of the Trust Estate in lieu of the named co-trustees for the sole and limited purpose of the retrial of this cause.
"2. Upon resubmission of this cause, make the following specific findings of fact and conclusions:
"(a) Determine what data should, and except for the conflict of interests of the co-trusteeBTNBwould, have been made available to the Comptroller; and, from such data, fix the value of the `old' bank stock as of the time such ascertainment is contemplated by the Federal Act. If the value as fixed is more than the value fixed by the Comptroller, award to the Trust as damages the sum equal to the difference against BTNB.
"(b) In which latter event (if the fixed value per share exceeds $32.80), determine the true bid value of the `new' bank stock had BTNB, absent its conflict of interests, actively sought potential bidders as of the time of the public auction as provided by the Federal Act. If the bid value so fixed is higher than the ascertained value of the stock as fixed under (a) above, award to the Trust as additional damages the sum equal to such difference against BTNB.
"(c) If the ascertained value of the `old' bank stock is less than $32.80 per share, but the per share auction value as fixed under (b) above exceeds $32.80, award to the Trust as damages the sum equal to the aggregate of the difference between such per share auction value and $32.80 against BTNB.
It is suggested that the price obtained by BTNB upon resale of *887 the `new' stock within the 30-day period following the auction, as prescribed by § 215a(d), is relevant data (subject, of course, to any admissible evidence of price variance) for consideration in making such determination.
"(d) Determine whether the ascertainable true value of Birmingham Realty stock and the asking price therefor of the `N.Y. block,' along with the other material factors, rendered BTNB's conflict of interests responsible for an abuse of discretion in refusing to agree to such purchase. If so, award to the Trust as damages such sum as the Court may deem reasonable and adequate to make the Trust whole in light of all competent evidence adduced on this issue.
"(e) Determine whether BTNB's evidenced conflict of interests is so inherent in the nature of its relationship to the Trust and to the Co-trustee Henley as to render BTNB disqualified to further serve as co-trustee to the instant Trust Estate; or, whether the resolution of the instant controversy will so dissolve the conflict of interests as to render BTNB fully competent and qualified to serve as co-trustee; and to implement by order of the Court such determination as the interest of the Trust Estate may require.
"3. Determination and award of expenses and fees chargeable against the Trust Estate shall be limited to those reasonably and necessarily incurred by the Temporary Trustee and his attorney." (295 Ala. at 48, 49, 322 So.2d 696-697)
On remand, the trial court appointed a temporary trustee and approved his employment of counsel to retry the case. After a trial which lasted six weeks, the court entered the following final decree:

"FINAL DECREE
"This cause came on for trial on the merits, following remand thereof by the Supreme Court of Alabama, and was submitted to the Court upon pleadings and proof after more than six weeks of trial time. Counsel appearing for the parties were as follows:
"Morris K. Sirote and Jack E. Held, attorneys for the Temporary Trustee; Lee C. Bradley, Jr. and MacBeth Wagnon Jr., attorneys for BTNB and the Holding Company; Donald E. Sweeney, Jr. and James W. May, Jr., attorneys for the individual Co-Trustee, John C. Henley, III; Julian L. McPhillips, Jr., Barry V. Hutner and Jim O'Kelley each as Assistant Attorneys General, in behalf of the Beneficiaries of the Trust Estate. The participation by the Attorney General in this cause has been active and continual from the outset until the present. Testimony of witnesses was received by the Court ore tenus and without a jury. Comprehensive post-trial and pre-trial briefs and letters which treated all possible subjects evident in the controversy were received and studied by the Court. The post-trial briefs and letters were accompanied by suggested decrees as prepared by the separate parties. The Court has duly considered all of the pleadings, written documents and exhibits filed in this cause, and all evidence and the briefs, letters and arguments of counsel, along with the data contained in the suggested decrees filed by all parties to this cause. Because it is believed by this Court that all of the contentions and authorities of all of the parties are fully expressed through these several documents all of this proffered material is expressly incorporated into and made a part of the record of this case for the edification of any reviewing Court.
"This Court finds that the findings of fact set forth in the suggested decree as filed by the attorneys for the Temporary Trustee are consistent with this opinion, and are fully supported by the overwhelming weight of the evidence. The Court is in agreement therewith, adopts the same as its own findings of facts and incorporates the same herein by reference.
*888 "This Court will deal with the specific instructions set forth in Syllabus (14) 1, 2(a)(b)(c)(d) and (e) of its opinion seriatim, and will base its orders in response to these instructions and will not depart from the orbit of their content. Some new issues and theories have been raised by the pleadings, but this Court, as stated, will confine itself to the express mandate of the Supreme Court as contained in its opinion of remand, except as to such other issues which are consistent therewith and have not been foreclosed thereby. All motions of the parties not heretofore ruled upon are hereby overruled.
"In accordance with the directions of the Supreme Court, the Court makes the following specific findings of fact and conclusions in the order indicated:
"1. The direction to appoint a `Temporary Trustee of the Trust Estate in lieu of the named Co-Trustees for the sole and limited purpose of the re-trial of this cause' has been complied with in the appointment of Jack H. Harrison, as the Temporary Trustee of the Linn-Henley Charitable Trust.
"2(a). Based upon the overwhelming weight of the evidence, `the Court has determined what data should, and except for the conflict of interest of the Co-Trustee BTNBwould, have been made available to the Comptroller; and, from such data, (fixes) the value of the "Old" Bank stock as of the time such ascertainment is contemplated by the Federal Act,' as hereinafter set forth in the decretal portion of this decree. Since this fixed value is more than the value fixed by the Comptroller, this decree will, in compliance with the directions of the Supreme Court, award to the Trust as damages a sum equal to the difference between the actual, fair and intrinsic value of the `Old' Bank stock surrendered by the Trust following the effective date of the Merger and the value thereof as determined by the Comptroller of the Currency.
"In further compliance with the mandate of the Supreme Court, the Court finds and determines that the following data should, and except for the conflict of interest of the Co-TrusteeBTNBwould have been made available to the Comptroller of the Currency.
"(1) All facts which were known to, or which could have been ascertained by BTNB, as of the effective date of the Merger, showing or reflecting the actual, intrinsic or fair value of the `Old' Bank stock as of December 31, 1968, appraising all material factors and elements affecting such value, on the basis that BTNB will continue as a going concern, including the nature and extent of its business and its operations, assets, good will, liabilities, earning capacity, investment value and market value of its stock, the earnings of the `Old' Bank in the past and the regularity of the payment of dividends as well as the future prospects and the growth potential of the bank; an estimate of its future earnings and payment of dividends, and of the expected growth of the bank in earnings and dividends for the future, including an estimate of the dividends expected to be paid by the bank during the year 1969;
"(2) The plans and goals which were known, or should have been known to management of BTNB, as of December 31, 1968 for the expansion of its facilities, opening of new branches, expansion of its leadership in the credit card field, the expected international growth for BankAmericard, its plans for the expansion of its computer services; and all other relevant factors which BTNB knew or should have known as of December 31, 1968 showing and indicating that BTNB would enjoy substantial growth in earnings and in payment of dividends in future years, giving due weight to each of the factors entering into a valuation of the stock of the bank on a going concern basis, and exercising in this respect the professional knowledge, skill and business acumen expected of a corporate Co-Trustee, and that diligence and care which a prudent man ordinarily uses in his own concern.
"The Court further finds from the evidence that management of BTNB was highly competent; that on December 31, 1968 it was fully aware of its manifold expansion plans, of its great potential for future *889 growth, and that its income and dividends would be increased in the year 1969 and thereafter, as in fact they were so increased to a very large extent; and that it was incumbent upon BTNB, as Co-Trustee and fiduciary, to furnish the data above enumerated to the Comptroller of the Currency, assuming that it was giving undivided loyalty to the Trust and that it eliminated its own selfish interests conflicting therewith.
"Based upon the foregoing data and all of the evidence introduced in connection therewith, the Court fixes the actual, intrinsic and fair value of the 27,460 shares of the `Old' Bank stock as surrendered by the Trust as of the time such ascertainment is contemplated by the Federal Act, i.e. December 31, 1968, at FIFTY AND NO/100 DOLLARS ($50.00) per share. The difference between the total value of this stock ($900,688.00), as fixed by the Comptroller of the Currency, and of the total value so fixed by the Court ($1,373,000.00) is FOUR HUNDRED SEVENTY TWO THOUSAND THREE HUNDRED TWELVE AND NO/100 DOLLARS ($472,312.00), to which must be added interest at six percent per annum from January 1, 1969 (the effective date of the Merger) to September 1, 1977 amounting to the sum of TWO HUNDRED THIRTY THOUSAND NINE HUNDRED SIXTY AND NO/100 DOLLARS ($230,960.00). The addition of these two sums amounts to SEVEN HUNDRED THREE THOUSAND TWO HUNDRED SEVENTY TWO AND NO/100 DOLLARS ($703,272.00) which must be awarded in favor of the Linn-Henley Charitable Trust and against BTNB.
"2(d) & (c). The Court finds that, under the Plan of Reorganization here in question, and under the newly-developed evidence and the law applicable thereto, it clearly appears that BTNB did not provide for the holding of a public auction of the `New' Bank stock, as provided by the Federal Act; that all such stock, except qualifying shares, were, upon the effective date of the Merger, transferred to and were owned by the `Holding Company'; and that thereafter the `New' Bank stock was neither marketable nor tradeable on any market. Additionally, on March 6, 1970, on which date BTNB attempted to have a public auction of this stock, more than 14 months elapsed since the effective date of the Merger. This unduly long delay was occasioned by the breach of fiduciary duty on the part of BTNB in improperly engaging in a struggle with the individual Co-Trustee, Henley, as to his right to dissent in behalf of the Trust from the Merger. In the meantime, however, the local market on bank stocks became greatly depressed.
"Accordingly, the Court further finds that BTNB made it impossible to hold a legal, realistic or meaningful public auction of the `New' Bank stock, as required by the Federal Act, and that the public auction of this stock purportedly held by BTNB on March 6, 1970, aside from the fact that BTNB failed to actively solicit bidders at this auction, was totally ineffectual. For these reasons the mandatory instruction by the Supreme Court to determine the true bid value of the `New' Bank stock, had BTNB, absent its conflict of interest, actively sought potential bidders as of the time of the public auction, as provided by the Federal Act, cannot, in the fact [sic] of the newly-developed evidence introduced by the Temporary Trustee, be effected by this Court.
"The Court further finds that, in the light of the newly-developed evidence adduced on the re-trial of this cause, and the legal theories advanced by the Temporary Trustee, that it was legally prohibitive and otherwise completely impracticable for BTNB to hold a realistic and meaningful public auction, in accordance with the requirements of the Federal Banking Act, of unregistered stock of the `Holding Company' on February 10, 1970, after a similar undue delay following the effective date of the Merger. For these reasons also the mandate of the Supreme Court under 2(b) and (c) above, even if it can be construed to apply to the public auction of the `Holding Company' stock, as well as to the `New' Bank stock, cannot be effected by this Court.
*890 "Prior to the auction of the Holding Company stock, however, the Co-Trustee-Henley, advised BTNB, as corporate Co-Trustee, that it was to the apparent and best interests of the Trust that, in the light of all the circumstances then existing, the Trust itself should bid upon and purchase this stock at the public auction, and requested that BTNB concur in this advice. At the auction, BTNB ignored Henley's advice and request and collaborated with the `Holding Company' in permitting it to be the sole bidder and purchaser of this stock.
"The Court further finds that such self-dealing on the part of BTNB, in collaboration with its affiliate, constitutes a separate, distinct and independent breach of trust on the part of BTNB which arises out of the same operative facts and the conflict of interests referred to by the Supreme Court in 2(b) and (c) above. Accordingly, the Court further finds that the claim for damages arising therefrom, as now presented and developed by the Temporary Trustee, is not inconsistent with anything determined by the Supreme Court under 2(b) and (c) and is so closely connected therewith, that this Court, especially under the New Alabama Rules of Court, may take cognizance thereof.
"The Court further finds from the evidence that Henley exercised sound judgment and prudence in seeking to protect the Trust against the inefficacious public auctions by suggesting that the Trust purchase this stock at the then depressed market prices, and that BTNB abused its discretion in failing to concur in the recommendations of Henley. Additionally, the Court finds that BTNB failed to resolve its conflict of interests either by petitioning this Court for instructions or by subordinating its own interests in favor of the Trust. By thus competing with the Trust and engaging in self dealing, in and about the administration of this Trust, BTNB was guilty of an even more flagrant breach of fiduciary duty than the failure to actively seek potential bidders as of the time of the public auctions referred to by the Supreme Court in 2(b) and (c) above.
"The Court further finds that the `Holding Company' in purchasing the 27,460 shares of its stock at the public auction in question willfully and knowingly participated in the violation of the fiduciary duty on the part of BTNB, with full knowledge of such breach on the part of BTNB, and that both BTNB and the `Holding Company' are liable to the Trust for the profits accruing to them upon the purchase of this stock to the extent of the difference between the bid price of $26 per share made by the `Holding Company' and the highest intermediate value of said stock up to the date of trial of $70 per share, and that both BTNB and the `Holding Company' are liable to the Trust for such profits amounting to the total sum of $1,208,240.00.
"2(d). This Court, from the overwhelming weight of the evidence, finds, relative to 2(d) that the ascertainable true value of Birmingham Realty stock and the asking price therefor of the `N.Y. Block', along with the other evident material factors, rendered BTNB's conflict of interests responsible for an abuse of discretion in refusing to agree to the purchase of that stock by the Trust. The unwarranted self-interest of BTNB in refusing this purchase resulted in the loss of a highly profitable investment for the Trust. The soundness of this investment for the Trust as a long-term investment should have been, in the exercise of due diligence and care, apparent to BTNB.
"The Court further finds that at the time the individual Co-Trustee proposed to BTNB that the 554 shares of Birmingham Realty Company stock be purchased by the Trust, the underlying value thereof was easily ascertainable and that the actual, intrinsic value of this stock at such time was approximately $2,000 a share; and that the assets of the Realty Company then consisted largely of land holdings, most of which were acquired many years ago at very low costs and were carried on its books at 1913 values, and that even at cost the company had a book value of $991.00 per share; that the current market price of the stock was $700.00 per share, and that it was common *891 knowledge in the local business community that the market price was undervalued and did not reflect the true asset values.
"The Court further concludes and finds that, as tentatively concluded by the Supreme Court, all the reasons assigned by BTNB when taken together, and fully analyzed, `are but supportive of the conclusions stated in the Trust Officer's testimony, and demonstrate the legal conclusiveness of the conflict of interest on behalf of BTNB with respect to the transaction.' The Court further concludes and finds that the principal reasons which motivated the bank in refusing to consent to the purchase of this block of stock are those testified to by its Trust Officer whose testimony was reintroduced on this re-trial and stands unimpeached.
"As a proximate consequence thereof, the Trust sustained a loss in the sum of $939,500.00, represented by the difference between the sum of $650.00 per share for which such stock could and should have been purchased and its actual value, amounting to the sum of $2,400.00 per share, which the Trust could have secured as a result of the tender offer to its stockholders made by the Birmingham Realty Company on or about May 1976.
"The Court further finds that BTNB's evidenced conflict of interest is so inherent in the nature of its relationship to the Trust and to the Co-Trustee, Henley, as to render BTNB unable to further serve as Co-Trustee to the instant Trust Estate; and that the resolution of the instant controversy will not dissolve this conflict of interest so as to render BTNB fully competent and qualified to continue to thusly serve as Co-Trustee.
"Accordingly, it is CONSIDERED, ORDERED, ADJUDGED and DECREED by the Court as follows:
"ONE. That the Linn-Henley Charitable Trust shall have and recover of Birmingham Trust National Bank the sum of FOUR HUNDRED SEVENTY TWO THOUSAND THREE HUNDRED TWELVE AND NO/100 DOLLARS ($472,312.00), together with interest thereon at the rate of six percent per annum from January 1, 1969 to September 1, 1977, amounting to the sum of TWO HUNDRED THIRTY THOUSAND NINE HUNDRED SIXTY AND NO/100 DOLLARS ($230,960.00), or the total sum of SEVEN HUNDRED THREE THOUSAND TWO HUNDRED SEVENTY TWO AND NO/100 DOLLARS ($703,272.00), the same representing the difference between the actual, intrinsic value of the `Old' Bank stock and the value determined by the Comptroller of the Currency, pursuant to the directions of the Supreme Court, together with the costs of litigation and a reasonable attorneys' fee, attributable to this claim, which the Court hereby reserves for future determination to be made upon application of the parties for reimbursement of such costs and expenses, including attorneys' fees.
"TWO: It is further ORDERED, ADJUDGED and DECREED by the Court that the Linn-Henley Charitable Trust shall have and recover of the Counter-Defendants, Birmingham Trust National Bank and Southern Bancorporation of Alabama the sum of ONE MILLION TWO HUNDRED EIGHT THOUSAND TWO HUNDRED FORTY AND NO/100 DOLLARS ($1,208,240.00), the same representing the profits accruing upon the `Holding Company' stock to the Counter-Defendants acquired by them at the public auction held on February 10, 1970.
"THREE: It is further ORDERED, ADJUDGED and DECREED that the Linn-Henley Charitable Trust shall have and recover of the Counter-Defendant, Birmingham Trust National Bank, the sum of NINE HUNDRED SIXTY NINE THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($969,500.00), the same representing the profits lost to the Trust by virtue of the breaches of its fiduciary duties in failing to concur with the individual Co-Trustee in the purchase of the 554 shares of stock of Birmingham Realty Company.
"FOUR: It is further ORDERED, ADJUDGED and DECREED that Birmingham Trust National Bank is hereby removed and discharged as Trustee for the Linn-Henley *892 Charitable Trust. In the place and stead of BTNB, The First National Bank of Birmingham is hereby named as Trustee of the Linn-Henley Charitable Trust upon its acceptance of this nomination and appointment.
"FIVE: It is further ORDERED, ADJUDGED and DECREED that all costs of litigation, including reasonable attorneys' fees applicable to the establishment of liability to the `Old Bank' and its stockholders, and the successor, the `New Bank' incident to the circulation of the fraudulent or misleading proxy statement, in violation of the securities and other laws, as set out in the additional findings of fact and conclusions of law of the Temporary Trustee made a part hereof, shall be charged against the Counter-Defendant, Birmingham Trust National Bank.
"SIX: The fixing and awarding of attorneys' fees costs of litigation and expenses and compensation to the Temporary Trustee is hereby reserved along with a determination of the question as to whom the said costs, expenses and attorneys' fees shall be charged.
"SEVEN: Counsel for the separate parties, (including the Temporary Trustee), are instructed to furnish to the Court their sworn applications for allowance of fees and expenses which they may claim, along with any supporting affidavits, within 15 days of the date of this instant decree, along with their claims and suggestions as against whom these fees and expenses should be charged; and the Counter-Defendant, BTNB, is hereby taxed with all taxable costs of this action, for which let execution issue.
"DONE and ORDERED this 4th day of October, 1977.
 "/s/ Wm. C. Barber 
 CIRCUIT JUDGE IN EQUITY
 SITTING"
BTNB appealed, claiming error in all aspects of the decree. The attorney general and Henley, as Co-Trustee, cross-appealed from that aspect of the decree which taxed costs and attorneys' fees against the Trust.
At the outset, it should be noted that no party argues that the plan of reorganization adopted by the majority stockholders was made for the purpose of squeezing or freezing out minority stockholders on a cash out basis. In fact, it is not argued that the bank breached its fiduciary duties to minority stockholders. The only contention made is that the bank breached its duty to the Trust in various ways. We shall address these theories in the sequence set out in the remand order in the opinion delivered on the prior appeal.

I.
Did BTNB breach its duty to the Trust by failing to furnish data to the Comptroller of the Currency which would have produced a higher appraisal of the old bank stock than $32.80 per share as originally fixed?
BTNB argues now, as it did on the prior appeal, that the provisions of § 215a(d), Title 12, U.S.C., to the effect that the Comptroller's appraisal "shall be final and binding on all parties" forecloses any question that the appraisal may not have been sufficient in amount. A majority of the court rejected that argument on the prior appeal, holding that if the bank breached its fiduciary duty to the Trust by withholding data which would be material to the Comptroller in making a valid appraisal, it was answerable to the Trust under state law. We adhere to that position.
It was the opinion of the majority that the language of § 215a(d), making the appraisal final and binding on all parties was not intended by the Congress to preempt state law in the area of fiduciary duties of a national bank serving in a fiduciary position. In fact, the act itself implicitly recognizes the role of state law in this area. § 215a(f) recognizes that a national bank acting as a fiduciary under appointment by a state court is subject to supervision or removal by that court, saying:
"... Nothing contained in this section [215] shall be considered to impair in any manner the right of any court to remove the consolidated national banking *893 association and to appoint in lieu thereof a substitute ... fiduciary, except that such right shall not be exercised in such a manner as to discriminate against national banking associations, nor shall any consolidated national banking association be removed solely because of the fact that it is a national banking association."
Additionally, the act itself refutes the contention that the appraisal is final and binding on all parties for all purposes. The appraisal is not binding on either party if at the public auction required to be held a price greater than the appraisal is received. In that event, the dissenting stockholder is entitled to receive the amount in excess of the appraisal.
Thus, as we read § 215, state courts are not foreclosed to inquire into the question of breach of fiduciary duty on the part of a national bank or a state bank involved in consolidation and merger as provided for by that act.
On the retrial of this case, the trial court determined that BTNB withheld data from the Comptroller of the Currency which reflected on the actual, intrinsic or fair value of the stock held in trust as of December 31, 1968. Based upon evidence before it, the court determined that the value of the stock was $50 per share as opposed to $32.80 fixed by the appraisal and awarded to the Trust the difference, plus interest from January 1, 1969, to September 1977, for a total award of $703,272.00. We affirm. The cause was remanded for a determination of this issue and there is evidence in the record as shown by the final decree to support the finding. Therefore, we should not disturb this finding by the court.

II.
On remand, the trial court was instructed to award to the Trust the difference in the value as determined by an appraisal (with all pertinent data taken into consideration) and the "true" bid value of the stock at auction, if that amount were higher than the appraisal figure. The trial court conceded its inability to carry out this mandate, and instead awarded to the Trust the difference in the amount paid for the stock by the holding company at the auction, $26 per share, and the highest intermediate value of the stock up to time of trial, $70 per share, for a total of $1,208,240. The theory advanced by the temporary trustee and the basis of this award in the court's decree, was that BTNB breached its duty to the Trust in refusing to purchase the stock for the Trust. Curiously, the temporary trustee pursued this theory even though Henley, on the first trial, argued that BTNB was guilty of a breach of duty in recommending that the Trust accept shares of stock in the new bank holding company in exchange for old bank stock.
The auction is statutorily mandated as a second step in the dissent procedure. It appears to be designed to further protect the rights of stockholders who exercise their right to dissent from the plan of merger or consolidation. If the stock brings a price higher than that for which it was appraised, the dissenting stockholders reap the benefit. The act expressly permits the purchase of the shares by the surviving banking association. The temporary trustee candidly admits that the stock could not possibly have brought a price at the auction in excess of the $32.80 per share which the Trust had been paid based on the appraisal. He obviously concedes, therefore, that it would not have attracted a bid in excess of the $50 per share which the court has now determined was the true appraisal value. Henley, the co-trustee, himself recognized that the stock would not attract bidders at over $32.80 and urged the investment for the Trust only up to a price of $23.25. He and the temporary trustee now contend that the trust is entitled to the difference in the price paid at auction and the highest market price since that time, not because the bid price did not reflect the true value of the stock, but because the bank refused to purchase the stock for the Trust. Admittedly, it now appears that the stock would have been a good investment for the Trust, or for anyone else for that matter. But, *894 the duty of the bank in its relation to the Trust must be measured against circumstances which existed at the time the alleged breach of its fiduciary duty occurred. The bank had a duty to conduct a meaningful public auction of the stock which the dissenting stockholders would have received in exchange for the stock they held but for their election to dissent from the plan of reorganization. The temporary trustee argues that the bank can be charged with breach of this duty by virtue of the plan of reorganization it elected to pursue. It is quite true that § 215, supra, does not contemplate the exact type of reorganization which management and the majority stockholders of BTNB adopted. That plan has heretofore been set out. It was, therefore, not entirely clear what stock should be offered at the auction, whether the stock of the new national bank or stock of the holding company. To resolve any question about this issue, both were offered. There was no evidence offered and no contention made that the price bid in each instance was not reflective of the fair market price then prevailing. That either stock was being offered at auction was a direct result of Henley as the individual co-trustee having exercised his statutory right to vote the stock held in trust against the plan of reorganization. He had a perfect legal right to so vote those shares. However, nothing in the law imposes liability on BTNB as co-trustee in rejecting Henley's proposal to then purchase as an investment for the Trust the very stock it would have received in exchange for the old stock had Henley not voted those shares against the plan of merger/reorganization. This is so assuming that the stock could have been legally acquired by the co-trustee as an investment for the Trust.
The general definition of a trustee's investment duties was first stated by the Supreme Court of Massachusetts in Harvard College v. Amory, 9 Pick. 446, 461, 26 Mass. 446, 461 (1830):
"All that can be required of a trustee to invest, is, that he shall conduct himself faithfully and exercise a sound discretion. He is to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested."
The Restatement of the Law of Trusts 2d, § 227 (1959), states the rule in the following language:
"In making investments of trust funds the trustee is under a duty to the beneficiary
"(a) in the absence of provisions in the terms of the trust or of a statute otherwise providing, to make such investments and only such investments as a prudent man would make of his own property having in view the preservation of the estate and the amount and regularity of the income to be derived ...."
The general rule is, absent express authority in the trust instrument, a corporate trustee is guilty of a breach of fiduciary duty where it purchases property which it owns for a trust administered by it. II Scott on Trusts, § 170.13 (3d ed. 1967).
"Unless authorized to do so by the terms of the trust, or by statute, a corporate trustee cannot, as a general rule, properly make or retain a trust investment in its own stock or bonds. Such a transaction involves self-dealing, or at least, divided loyalty. ..." (54 Am. Jur., Trusts, § 413)
A regulation to like effect has been adopted by the Comptroller of the Currency binding national banks. 12 C.F.R. § 9.12(a).
In fact, Title 12, § 83, U.S.C., prohibits the purchase or retention by a national bank of its own stock for its own account. This, of course, explains why § 215a(d), although allowing a banking association to purchase the shares of dissenting shareholders at auction, expressly says it may do so only "for the purpose of reselling such shares within 30 days ...."
BTNB was a co-trustee of the Linn-Henley Trust. Multiple trustees must act jointly and in concert and may not delegate to each other or to another powers *895 calling for discretion and judgment. Restatement of the Law of Trusts 2d, § 194. It is assumed that a settlor generally appoints more than one trustee because of his desire to attain for the beneficiaries of his trust the benefit of the wisdom of each, and the courts will not, as a general rule, interfere with the exercise of discretionary powers of trustees absent fraud or abuse of discretion. See: The Co-Trustee Relationship, Vol. 8.9 Real Property, Probate & Trust Journal (Spring 1973).
Tested by these standards, did BTNB breach its duty to the Trust in refusing to acquiesce in Henley's suggestion to acquire as an investment for the Trust the stock offered at auction?
We hold that it did not and reverse that part of the decree of the trial court so holding.
One of this state's outstanding attorneys, while representing the Linn-Henley Trust, expressed grave doubt that the co-trustees had the power under the Trust to convert the inherited stock in the bank to stock in the holding company in connection with the merger/reorganization. In other words, an attorney while representing the Trust, questioned whether the Trust could properly hold stock in the holding company assuming it did not dissent from the plan of reorganization. Under these facts, we cannot hold as a matter of law that BTNB breached any fiduciary duty in refusing to purchase shares in the holding company or "new" bank stock as a new investment for the Trust.

III.
Was BTNB guilty of a breach of its fiduciary duties in refusing to concur in Henley's recommendation that the Trust purchase 554 shares of Birmingham Realty Company stock in September, 1970?
Undeniably, a trustee owes undivided loyalty to the Trust. This does not mean, however, that he is liable for a loss to the trust estate which did not result from a breach of that duty. III Scott on Trusts, §§ 204, 211 (3d ed. 1967).
The temporary trustee asserts that the court held on the first appeal that BTNB had breached its duty to the Trust in refusing to buy the Birmingham Realty stock. This is erroneous. The issue was remanded for a determination of whether BTNB had abused "its discretion in refusing to agree to the purchase." The temporary trustee argues that BTNB should be held liable to the Trust for its "deliberate disregard of foresight."
BTNB is liable to the Trust in the Birmingham Realty matter only if it breached some duty to the Trust in refusing to make this investment at the time the decision was made. Was it an investment which a prudent man, managing his own affairs, would have made, based upon information then available? Liability cannot be based on the fact it subsequently developed that the investment would have been a good one. This is but the converse of the rule that a trustee is not liable if he makes an investment in a security which subsequently depreciates in value. III Scott on Trusts, § 204, supra, expresses the rule as follows:
"The failure to make a profit which does not result from a breach of trust does not subject the trustee to liability. Thus if by the terms of the trust he is permitted but is not directed to invest in certain securities, he is not liable for failure to make the investment, although the securities subsequently appreciate in value...."
The rule has also been summarized by Headley, Trust Investments, 110 Trusts & Estates 739 (1952), as follows:
"The first and all inclusive requirement of the law is that a trustee shall act with complete and undivided loyalty to his trust. Second is that a trustee shall act prudently in the selection and management of investments. The elements of prudence are:
"(1) Carea trustee must gather and weigh the facts and base his decisions on them rather than on rumor or guesswork;

*896 "(2) Skilla trustee must exercise the skill of the average person as a minimum; and if he has more than average skill he must exercise such skill as he has;
"(3) Cautiona trustee must not take chances which will imperil the accomplishment of the purposes of the trust.
"...
"... There must be balance between security of principal and amount and regularity of income; and the governing motive of the trustee must be sound investment for a long period and not speculation for a profit. .."
With specific reference to a trustee's investing in common stocks, this author says:
"... They represent no promise to return a dollar amount to the investor; their dividends are dependent on earnings and the action of a board of directors; they have always afforded an attractive vehicle for speculation. Nevertheless some of them have demonstrated, over a long period of years, the qualities required for sound permanent investments. Intrinsic values have been maintained and dividends have been adequate and regular. The principal has been reasonably safe for a number of reasons: competent management, sound financing, position in an essential industry, a successful record and an adequate market. ..."
Tested by this standard, we cannot say that BTNB breached its duty to the Linn-Henley Trust in declining to invest its funds in stock of Birmingham Realty Company in 1970. The Trust instrument permitted the co-trustees wide discretion in making investments, but it did not direct them to invest in any particular security. In this instance, the co-trustees disagreed on the advisability of investing trust funds in Birmingham Realty stock. Henley urged the investment partly because the price at which the 554 shares could be purchased in 1970 was below book value and because the real estate holdings of Birmingham Realty had a market value far in excess of the value carried on the books of the company. Although the latter fact was widely known, stock in Birmingham Realty had traditionally sold at less than book value. One explanation for this was that the dividends paid were also traditionally low. The only way the underlying value of the real estate could be realized by the stockholders was liquidation, which was not practical.
There were a number of witnesses, knowledgeable about Birmingham Realty and themselves experts in the investment field, who testified that they had been willing to pay substantially more than market for all of the stock but would not be interested in less than all at a substantially lower price. Each of these witnesses testified that in 1970 Birmingham Realty stock was not a good investment for the Trust.
The record demonstrates that there existed a number of sound reasons for BTNB to reject Henley's proposal to make this investment. It fails to show wherein it was under a duty to do so. Therefore, it cannot be surcharged for its actions absent a showing of breach of some duty on its part. Consequently, that part of the court's decree awarding damages to the trust in the amount of $969,500 for failure of BTNB to concur in the purchase of 554 shares of Birmingham Realty Company is reversed.

IV.
Was BTNB properly removed as a co-trustee for the Linn-Henley Trust?
The settlor of this Trust, over a period of 45 years, served as a director, president and, finally, chairman of the Board of BTNB. In designating the bank as co-executor and as co-trustee of his charitable trust he specified by his will that:
"... the Birmingham Trust National Bank, a national banking association (or such successor corporation as shall succeed said Birmingham Trust National Bank by purchase, merger, consolidation, conversion or change of charter or name)."
The law governing removal of trustees is very clear in this state as elsewhere.
In II Scott on Trusts (3d ed. 1967), the following appears:

*897 "§ 107. A court which has supervision over the administration of trusts has power to remove a trustee for proper cause. Unless the grounds of removal are stated in a statute, and unless the grounds so stated are exclusive, the matter is one for the exercise of a sound discretion by the court. ...
"§ 107.1. The court is less ready to remove a trustee who was named by the settlor than it is to remove a trustee appointed by the court or by a third person in the exercise of a power to appoint trustees. ..."
Also, in IV Scott on Trusts (3d ed. 1967):
"§ 387. A trustee of a charitable trust may be removed as trustee for the same reasons for which a trustee of a private trust may be removed. Thus he may be removed for serious breaches of trust, for unfitness, for long-continued absence and the like. He can also be removed where his views are hostile to the purposes of the trust ...."
This court has stated the rule which prevails in this state:
"The removal of a trustee is a drastic action which should only be taken when the estate is actually endangered and intervention is necessary to save trust property. In re Crawford's Estate, 340 Pa. 187, 16 A.2d 521; In re Hodgson's Estate, 342 Pa. 250, 20 A.2d 294; Chambers v. Mauldin, 4 Ala. 477; Satterfield v. John, 53 Ala. 127. This is especially true where the trustee is named by the settlor. In re Crawford's Estate, supra; Taylor v. Errion, 137 N.J.Eq. 221, 44 A.2d 356, affirmed 140 N.J.Eq. 495, 55 A.2d 11.
"While the removal of a trustee is a matter resting largely within the sound judicial discretion of the trial court, it is equally clear that an abuse of that discretion renders its exercise subject to review...." Ingalls v. Ingalls, 257 Ala. 521, 527, 59 So.2d 898, 903 (1952)
See also: Walker v. Amason, 369 So.2d 786 (Ala.1979).
We have tediously reviewed the record in this case, which is voluminous, as one would expect in a trial lasting six weeks or more, and while we find evidence that the relationship between officers of BTNB and John Henley became strained during the merger/reorganization process and each of them took different positions as to what was in the best interests of the Trust, there is nothing to indicate the trust estate was endangered at any time. BTNB was in an awkward position in connection with the appraisal of the bank's stock held in trust. Its undivided loyalty to the Trust required it to attempt to have the stock appraised at a figure to obtain for the Trust the highest amount possible. It had a statutory obligation as "the receiving association" under Title 12, § 215a(d), to promptly pay the appraised amount to the dissenting shareholders. These conflicting obligations could not be reconciled and BTNB should have, as we held on the first appeal, sought guidance from the court. However, its failure to do so does not require its removal as a co-trustee. A similar situation is unlikely ever to recur and its having occurred one time does not disqualify BTNB from fulfilling its obligations under the trust instrument. Henley conceded that he and the bank's trust department had worked harmoniously in the discharge of their respective responsibilities to the Trust except for the matters concerned in this litigation and could continue to do so. We find nothing in the record to indicate otherwise. Therefore, that portion of the decree removing BTNB as co-trustee of the Linn-Henley Trust is reversed.

V.
The matter of attorneys' fees and costs:
The attorney general and Henley appealed that part of the decree awarding attorneys' fees from the Trust. They argue that those fees should be paid by BTNB and urge that the court erred in taxing them as costs against the Trust. They contend that the decree is in all other respects without error, except that Henley questions the amount of the award in fees to attorneys for the temporary trustee and for the services of the temporary trustee himself. *898 BTNB asserts that the court properly taxed costs and attorneys' fees against the Trust, but also questions the amount of attorneys' fees awarded to various parties.
The trial court correctly held that such costs and attorneys' fees as are awardable may, under our law, be taxed against the Trust. Code 1975, § 34-3-60.
In Zimmerman v. First National Bank of Birmingham, 348 So.2d 1359, 1367 (Ala. 1977), we addressed this issue and stated the rule as follows:
"According to a well-established line of cases,
"`[s]ection 63, Title 46, Code, is largely an enactment of the ancient principle of equitable origin, and there enforceable, which was referred to as costs between solicitor and client and said statute makes it apply at law as well as in equity when justified. That principle is that a complainant in equity, who at his own expense has maintained a successful suit for the preservation protection or increase of a common fund or of common property, or who has created at his own expense or brought into court a fund in which others may share, may have paid to him, or sometimes directly to his attorney, an attorney's fee for such services.
"Penny v. Pritchard & McCall, 255 Ala. 13, 17, 49 So.2d 782 (1950). ..."
Therefore, that part of the decree taxing attorneys' fees against the Trust, and made the basis of Henley and the attorney general's cross-appeal, is AFFIRMED.
Because we reverse the trial court's decree with regard to issues delineated in Sections II, III and IV herein, we must remand the attorneys' fee issue for reconsideration by the trial court in light of this opinion. It should determine the time spent and the contribution made by whom in connection with the issue in Section I (the appraisal issue) and fix attorneys' fees accordingly.
AFFIRMED AS TO SECTION I; REVERSED AND RENDERED AS TO SECTIONS II, III, AND IV; AND REMANDED WITH DIRECTIONS AS TO AMOUNT OF ATTORNEYS' FEES.
TORBERT, C. J., and BLOODWORTH, JONES, ALMON, EMBRY and BEATTY, JJ., concur.
MADDOX, J., dissents as to Section I, and concurs in the remainder.
FAULKNER, J., not sitting.
MADDOX, Justice (concurring in part and dissenting in part).
I dissent as to Part I, on some of the same grounds which I advanced, and which former Chief Justice Howell Heflin advanced, in our separate dissents on the original appeal. 295 Ala. at pages 50 and 56, 322 So.2d 688.
Even though this case involves thousands of dollars, the basic and controlling facts are undisputed. BTNB, as a co-trustee wanted to merge. Co-trustee Henley opposed merger. Under national banking laws, Henley, as co-trustee, became, in effect, the sole trustee in the merger proceeding. Exercising his right, he dissented, thus triggering the process of stock evaluation, sale at public auction, etc. The procedure outlined by federal law was followed in the merger proceeding. During the merger proceeding, Henley, because of the mandate of federal law, was the "dissenting stockholder."
The majority upholds a finding by the trial court that the bank acted in bad faith at the evaluation stage. The evidence is uncontradicted that BTNB urged merger. Had Henley, as sole trustee, not dissented, there never would have been any necessity for the subsequent events, which Henley now complains about. In short, had Henley followed the advice of BTNB, the Trust estate would have been substantially benefited, not harmed. Why then should BTNB be accused of bad faith and be saddled with a loss resulting from an event over which it had no control, Henley's dissent?